[No. 28266. Department Two. May 2, 1941.]

*In the Matter of the Estate of* ANNA SCHAFER, *Deceased.*[1]

'Reported in 113 P. (2d) 41.

518

*John J. Sullivan* and *Carl Pruzan,* for appellant.

*Stedman & Stedman,* for respondent Schloeman.

*John W. Heal, Jr.,* for respondent Moe.

JEFFERS, J.—This is a will contest instituted by Nancy W. King, niece of Anna Schafer, deceased. Mrs. King was the principal beneficiary in two former wills made by Anna Schafer, and is also assignee of all the rights of her mother, Mary Winter, sister of deceased, who claims she would be the sole heir of the Anna Schafer estate if there were no will. The will being contested was executed on January 13, 1940, one D. W. Schloeman being named executor, and the principal beneficiary being Melvin A. Moe. This instrument was drawn by Lewis L. Stedman, who, with one M. N. Olsen, witnessed the execution of the will.

The petition alleges that the execution of the will was obtained through undue influence of Melvin A. Moe and others, at a time when the deceased was greatly weakened by disease in mind and body, and advanced in age.

The executor filed an answer to the petition, denying the allegations of undue influence, and alleging affirmatively that, on January 13, 1940, when Mrs. Schafer made the will in question, she was of sound and disposing mind and memory, knew the extent of her property and the natural beneficiaries of her bounty, and was capable of transacting business of any character. Melvin A. Moe also answered the petition, admitting

the death of Anna Schafer, January 16, 1940, and denying the other allegations of the petition.

A hearing was held on June 17, 1940, at which time oral testimony of many witnesses was received, and the depositions of Nancy W. King and her mother, Mary Winter, theretofore taken, were admitted and read into the record. The trial court, after filing a very exhaustive memorandum opinion, on July 23, 1940, made and entered a decree denying the petition of Nancy W. King and upholding the instrument executed by Anna Schafer on January 13, 1940, as her last will and testament. Mrs. King has appealed from the decree entered.

Appellant claims the court erred: (1) In failing to hold that the purported last will and testament of Anna Schafer was the result of fraud and undue influence on the part of Melvin A. Moe; and (2) in failing to hold that the evidence regarding Mr. Moe's conduct was so suspicious as to raise a presumption of fraud and undue influence, which presumption Mr. Moe failed to overcome.

While it is not specifically contended by appellant that Mrs. Schafer did not have the mental capacity to make a will on January 13, 1940, there was considerable testimony introduced relative to the effect on her mind caused by her sickness and the opiates given to her during such sickness, so that Mrs. Schafer's mental condition, especially in view of her age, is a factor which may properly be considered along with the other facts, in determining the question of undue influence.

In considering the testimony in this case, it may be well to have in mind certain well-established principles. The right to dispose of one's property by will is not only a valuable right, but one assured by law. *In re Phillip's Estate,* 193 Wash. 194, 74 P. (2d)

1015; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331. The rule in regard to testamentary capacity is that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate and which he intends to dispose of, and to recollect the objects of his bounty. *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47; *Dean v. Jordan, supra.*

■ Where a will, rational on its face, is shown to have been executed in legal form, the law presumes testamentary capacity in the testator, and that the will speaks his wishes. *In re Hanson's Estate,* 87 Wash. 113, 151 Pac. 264; *In re Riley's Estate,* 163 Wash. 119, 300 Pac. 159. In order to overcome a will, the evidence must be cogent and convincing. *In re Johanson's Estate,* 178 Wash. 628, 35 P. (2d) 52.

■ In order to vitiate a will, there must be something more than mere influence. There must have been undue influence *at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. Dean v. Jordan, supra,* and cases therein cited.

In *Dean v. Jordan, supra,* this court, while recognizing the rule that fraud or undue influence must be established by evidence that is clear, cogent, and convincing, stated that, nevertheless, certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument, the most important of such facts being: (1) That the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the

estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting undue influence, and the naturalness or unnaturalness of the will.

In *Foster v. Brady*, 198 Wash. 13, 86 P. (2d) 760, we reaffirmed the rule that opportunity to exert undue influence is not sufficient to support a finding of undue influence, even though the circumstances under which a will was executed might arouse suspicion. We also stated, in the cited case, that ordinarily undue influence can be established only by circumstantial evidence, and that the circumstances surrounding the execution of a will may be so suspicious and suggestive as to raise a presumption of undue influence, which may be overcome only by clear and satisfactory evidence that no such influence was exerted. The cited case seems to rely upon the cases of *Dean v. Jordan, supra,* and *In re Beck's Estate,* 79 Wash. 331, 140 Pac. 340, to sustain the statement that, where the circumstances surrounding the execution of the will are so suspicious as to create a presumption, that presumption can be overcome only by clear and satisfactory evidence. We seriously doubt if either of the cited cases goes as far as above stated. The *Jordan* case states:

"The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, *in the absence of rebuttal evidence,* may even be sufficient to overthrow the will," (Italics ours.)

citing *In re Beck's Estate,* 79 Wash. 331, 140 Pac. 340, to sustain the above statement.

On this point we quote from *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515, which has been cited in

many of our cases, up to and including the *Jordan* case, *supra*:

"Mere suspicions are not sufficient to sustain the burden of proof which the law imposes upon the contestants. In the case of *In re McDevitt, supra* [95 Cal. 17, 30 Pac. 101], the court said:

" 'Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, *do more than raise a suspicion.* It must *amount to proof,* and *such evidence has the force of proof* only when circumstances are proven which are inconsistent with the the claim that the will was the spontaneous act of the alleged testator.' " (Italics ours.)

Mrs. Schafer was about eighty years of age at the time of her death, which occurred January 16, 1940. She had lived in Seattle for many years, and had conducted her own affairs, her husband having been dead for some years. Deceased had no children and no relatives in this part of the country, and, so far as this record shows, never had had, but she did have a sister, Mrs. Mary Winter, living in Sewickley, Pennsylvania, and a niece, Mrs. Nancy W. King, daughter of Mary Winter, living in Springfield, Massachusetts. Mrs. Winter, as the only surviving heir of Mrs. Schafer, would have inherited the Schafer estate had Mrs. Schafer left no will.

Mrs. Schafer had not seen her sister or her niece since 1929, at which time they visited Mrs. Schafer in Seattle. Deceased came west many years ago, and outside of some years spent in Alaska, had lived continuously in Seattle. Mrs. Schafer had made several trips back east to visit her sister and niece, but all of these trips were prior to 1929.

While both Mrs. Winter and Mrs. King, in their depositions, testified that they had written regularly to Mrs. Schafer through the years and up to the time

of her death, and that Mrs. Schafer had written to them, the only letters produced by appellant, written to her by Mrs. Schafer, were three letters written in 1935, and the only letter or card purporting to have been received by Mrs. Schafer was a Christmas card received in 1935. Mrs. King testified she had received other letters from Mrs. Schafer, but had destroyed them. It also appears that Mrs. Schafer, while in the hospital, in December, 1939, received a Christmas card from Mrs. King.

Mrs. Schafer became acquainted with Grace Haines, assistant secretary of the Citizens Federal Savings & Loan Association, in connection with her business with that institution. Mrs. Rose Meyer, bookkeeper at the Consumers Compressed Yeast Company, first met Mrs. Schafer when the latter came into the office and inquired if she might have some boxes, used by the company for their garbage. Olga C. Wolfe, a nurse, had known Mrs. Schafer for many years, and had taken care of her at times when she was ill. Mrs. Marion Knox apparently met Mrs. Schafer in connection with some political campaign, and had known her for five or six years. These witnesses and others, including Mr. Seijas, testified that they often heard Mrs. Schafer speak of Nancy King in affectionate terms; that Nancy was her favorite niece; that Mrs. Schafer also spoke very affectionately of her sister, Mary Winter.

On the other hand, there was testimony of several disinterested witnesses that they never heard Mrs. Schafer mention her niece, but that she did speak of Mr. Moe, saying that he had been like a son to her.

From this record, it appears conclusively that Mrs. Schafer was a woman of strong will, and not easily influenced, especially where money matters were concerned. As typical of the testimony relative to this characteristic, we quote from Miss Haines' testimony:

"Q. Mrs. Schafer was a woman of strong mind, wasn't she? A. Oh, very. Q. And she was quite determined, and it was hard—she couldn't be influenced? A. Well, no, she certainly couldn't. You see, when I knew her, when she was a well woman, she certainly couldn't be influenced. She had very strong likes and dislikes, and she liked a person for a few days and then she disliked them as much the fourth day as she had liked them the first day."

Miss Haines was appellant's witness.

We also quote from the testimony of appellant:

"Q. Now was she [referring to Mrs. Schafer] known to you as a woman of determined character? A. Yes, she was. Q. That is, she knew her own mind? A. Yes. Q. And an outspoken woman? A. She was very set. Q. Very set in her ways? A. Yes. Q. And usually when she made her mind up, she wouldn't change it, would she? A. No. Q. She was, in other words, determined that her own thinking power would prevail? A. Yes, she was . . . Q. And as far as you know, that condition continued until she died? A. It seemed so in the letters . . . Q. In the correspondence between you and your aunt, there was never any indication that her mental processes were not functioning? A. No."

It is also apparent, from the testimony, that Mrs. Schafer had been and was eccentric, as shown by the testimony of Miss Haines that Mrs. Schafer first opened an account under the name of Anna Cluney (her maiden name), then changed it to Anna Schafer, and then apparently had someone draw her money out and again deposit it under the name of J. J. Wood. This characteristic is also shown by the testimony of Mrs. Meyers that Mrs. Schafer picked up boxes and carried them up to her apartment, where she apparently used some of them as cupboards. Mrs. Schafer lived simply in a rented apartment, and her estate was apparently of the value of something over five thousand dollars.

Mrs. Schafer first met Mr. Moe in November, 1935, at which time he delivered some wood and coal to her. In this delivery there were nine sacks of coal, and about a quarter of a cord of wood, which Mr. Moe, at the request of Mrs. Schafer, carried into her woodshed. After the wood and coal had been carried in, Mrs. Schafer insisted that Mr. Moe come into the house to have a cup of coffee and some chili, and apparently the friendship started at that time.

It appears that Mrs. Schafer had ordered a half ton of coal, and that it takes ten sacks to make a half ton, whereas only nine sacks were delivered. This is the first incident referred to by appellant. In regard to this matter, appellant's brief, under the sub-heading "The Coal Incident," states: "In the first place, Mr. Moe's very introduction to Mrs. Schafer was tainted with dishonesty, fraud and deceit, and unfair dealing." The testimony shows that Mr. Moe did not load the coal, and that he delivered it in accordance with the direction of his employer. It further appears that, when asked by Mrs. Schafer how many sacks it took to make a half ton, he told her ten, and advised her to take the matter up with his employer. It is apparent that Mrs. Schafer did not think the transaction was dishonest or deceitful, as she subsequently ordered more fuel from the same concern, which was delivered by Mr. Moe about a month later.

The next time Mr. Moe saw Mrs. Schafer was on Christmas, 1936, at which time Mrs. Schafer invited him out to have dinner with her. From this time on, it appears that Mr. Moe would drop in to see Mrs. Schafer every week and sometimes oftener, on his way to or from his work. It further appears that he had an automobile and would take Mrs. Schafer around town and on little trips; that he took her to Olympia several times to see the governor. Mr. Moe testified that he never

asked Mrs. Schafer about her affairs, and that she did not discuss them with him, except once in a while when she had to get a note collected.

While there is some testimony that Mrs. Schafer complained of her health some before she went to the hospital, she was not confined to her bed, but was up and around, conducting her own affairs as usual. Mrs. Schafer apparently consulted Dr. Hill, at the instigation of Mrs. Wolfe, and was by the doctor advised to go to the hospital.

Mrs. Schafer was taken to the Swedish hospital on November 29, 1939, and up to that time she had no will. The first will was drawn by Mr. Seijas, who had been called by Miss Haines, on the Saturday before Mrs. Schafer was operated upon. Mr. Seijas had been her attorney, at least in small matters, for some time, and was well acquainted with her. Mr. Seijas testified that he had suggested to her before that she should have a will, but that she put off making one. Mr. Seijas further testified that, at least on two previous occasions, Mrs. Schafer had told him she wanted everything to go to Nancy. On the day the will was drawn, according to Mr. Seijas' testimony, he and Mrs. Schafer had quite an argument as to whether he or Miss Haines should be named as executor of the will, but he finally convinced Mrs. Schafer that, if he was to look after her affairs, it would be better if he was named executor, and to this Mrs. Schafer finally consented. The will was then drawn, and Mr. Seijas was named executor, and Nancy King was the principal beneficiary. The will provided, among other things, for a metallic casket and burial in the Catholic cemetery, and a nominal bequest was made to Mr. Moe.

There is no testimony in this record indicating that Mr. Moe had anything to do with procuring this will

to be drawn, or that he knew its provisions. After the will was executed, it was left with Mrs. Schafer.

The second will was drawn by Warren Brown, at the hospital, on December 3, 1939. The facts relative to the execution of this will, as stated by Miss Haines, are not in dispute, and are as follows:

"Q. Will you tell the court about the occasion of Mr. Brown and the will? A. The nurse, Miss Nyberg, if I remember her name correctly, called me and asked me to go to the Swedish hospital, that Mrs. Schafer was ill. Q. Do you know about when this was? A. It was one Saturday morning. She was operated on on Monday, and this was Saturday before she was operated on. I won't know the date. I went up there and she asked me about her bill. I couldn't pay her bill—it was a savings account. I asked her at the time if she had a will, and she said that she had, yes—a little piece of paper in her pocketbook. I said 'Haven't you a will that was made out by your attorney?' And she said she did not. I asked her if she didn't want to make a will, and she said, 'Yes, maybe I should.' There was a lot of conversation about it—I wouldn't remember word for word—and I called her attorney, Mr. Seijas, and asked him if he would come to the hospital and make the will. Q. Thereafter, I will ask you whether or not you called Warren Brown? A. Then on Sunday morning Miss Nyberg called me and said that she was unhappy about the way Mr. Seijas had made this will [first will], and would I come up, and I went up there and she said 'I want you to draw a will.' Well, I couldn't draw the will, and I told her I couldn't draw the will, I didn't know anything about drawing a will, and she said then 'Will you have somebody to draw the will?' And I called Warren Brown, of our attorneys. Q. Of Bogle, Bogle & Gates? A. That is right. And he came up. We waited quite a little while because he was away from home, and Mr. Brown came up and made the will out . . . Q. When Mr. Brown drew the will do you know where it was taken? A. Yes. When I went back in the room she tore the will Mr. Seijas had drawn in two and she handed me those two pieces of paper, together with the will Mr. Brown

had drawn, and said 'I want you to have them.' I said 'No, I think you should keep them.' She said 'Take them down and put them in your safe,' and that is what I did . . . Q. How long did they remain there? A. Oh, I would say—I wouldn't know now—I think it was either the latter part of December or around the first of January—I just wouldn't know, quite a little while that Dr. Hill called me up and said that Mrs. Schafer would like to have me bring the wills to the hospital, and I did. Q. What happened when you went to the hospital with the wills? A. I gave them to her. She was rather in an unhappy frame of mind, and I gave the wills to her."

Warren Brown testified he was called to the hospital December 3rd, by Miss Haines, to make a will for a friend; that Miss Haines took him in and introduced him to Mrs. Schafer, and that he thought Mr. Moe and Mrs. Meyer were out in the hall; that he went over the matter with Mrs. Schafer, and nobody was in the room at the time; that he drew the will in longhand at Mrs. Schafer's bedside, and that Nancy King was the principal beneficiary; that Mrs. Schafer said nothing about Nancy King, except that she wanted her to have certain things. In this will Mr. Moe also received a nominal bequest, a Mrs. Denny received a marquise pin, and Rose Meyer some jewelry. No mention was made of a metallic casket.

Mr. Brown further testified that Mrs. Schafer directed him as to how she wanted the will drawn, and he followed her directions; that Mrs. Schafer was perfectly competent on that day, and that she told him she was going to have an operation the next day, and that was the reason she wanted the will drawn; that he had never seen Mrs. Schafer prior to the day the will was drawn; that Mrs. Schafer had in mind definitely what she wanted to do, and was very positive in her instructions.

Dr. H. S. Hill, who operated on Mrs. Schafer, testified that she came to his office with Mrs. Wolfe; that the mental condition of Mrs. Schafer was at all times very acute; that he talked with her the night before she died, and that her mental condition was practically the same as it had been at all times. In answer to a specific question, the doctor further testified that, on the 13th of January (the date the last will was executed), her mental condition was the same as it had been; that, at that time, he moved her to another room, which was a little more reasonable in cost than the one she had been occupying, and Mrs. Schafer expressed pleasure in the fact that she would save a little.

Dr. Hill further testified that, in his opinion, the opiates, as administered, did not affect Mrs. Schafer's mind; that he never told her what her condition was, and that she looked forward to the time she would be well, and "made her preparations what she was going to do when she got well"; that he told Mr. Moe a couple of weeks before her death that Mrs. Schafer would never get out of bed. The doctor further stated that Mrs. Schafer never discussed her relatives with him, but that he knew she had a niece, because Mrs. Wolfe came into his office with a letter Mrs. Wolfe had written to this niece in the east; that Mrs. Wolfe told him Mrs. Schafer would not let her send the letter.

In answer to a question by the court as to Mrs. Schafer's mental condition on January 12, 1940, the doctor answered that, in his opinion, she was mentally competent at that time, because on that date she had talked to him about her finances, and her mind seemed bright along that line; that she was not anticipating death. The court also asked the following question of the doctor: "Did you ever discuss Mr. Moe with her, or did she discuss Mr. Moe with you?" after which the following occurred:

"The Witness: Only once.

"The Court: When was that?

"The Witness: That was perhaps a couple of weeks beforehand. She was feeling a little better and she said after she got up and got well she wanted to take Mr. Moe on a trip, wanted to go on a trip together, and I said 'That is all right, I hope you have a nice time,' and so on—and that was dismissed that way."

The doctor stated that he never discussed with Mr. Moe his relationship with Mrs. Schafer.

Dr. Hill further testified that Mrs. Schafer spoke to him about Mr. Seijas, and that she asked him to have the nurse get in contact with someone to draw her a new will, as she was very much displeased with the first will which she made; that he knew nothing personally about the wills; that he saw Mr. Moe frequently at the hospital after his working hours, but only spoke to him once or twice.

There is nothing in this record to indicate that Mr. Moe had anything to do with procuring the execution of this second will, and it does not appear that he ever knew its provisions, at least until after it was returned to Mrs. Schafer by Miss Haines, and even after that, it is not clear that he knew just what its provisions were.

We now come to the third will, drawn by Mr. Stedman on January 13, 1940, being the instrument in question here. Mr. Stedman was first called by appellant, and interrogated as to whether or not Mr. Moe had informed him that Mrs. Schafer had relatives living, to which Mr. Stedman answered that he thought Mr. Moe had told him Mrs. Schafer had relatives, but that he did not know their addresses. Mr. Stedman was further interrogated by counsel for respondent as follows:

"Q. Did Mrs. Schafer ever tell you who her relatives were? A. No; she did not. I asked her if she

did not wish to remember them in her will, and she said very positively that she did not, and she wished to have a statement in her will, which is there. Q. Did you ask her at that time who her relatives were, or where they lived? A. As I recollect, she stated she had a niece in the east, but she didn't give me her address, and I did not, inasmuch as she used positive language not wishing to remember them in the will, I was not insistent on obtaining their address."

The witness further testified that Mrs. Meyer, to whom reference has heretofore been made, called him up January 24th, and talked with him about some jewelry which she claimed Mrs. Schafer had given to her, and which she had refused to turn over; that Mrs. Meyer did not give him the addresses of any of Mrs. Schafer's relatives, but did say that within a few days he would hear from the attorney for Mrs. King.

Mr. Stedman was called as a witness for the executor, and testified that, on January 12, 1940, he was called by Mr. Schloeman, of the Swedish hospital, who stated that there was a party who wanted to make a will; that, after he got to the hospital, he was informed by Mr. Schloeman that it was Mrs. Schafer who wanted to make a will; that he believed Mr. Moe was there, and that the three of them went up to Mrs. Schafer's room, where Mr. Schloeman introduced him to Mrs. Schafer; that Mr. Schloeman and Mr. Moe remained in the room while he received his instructions as to what to put in the will; that he talked at some length to Mrs. Schafer about the will and how she wanted it drawn; that Mrs. Schafer, among other things, spoke about a note she had had Mr. Moe get from an old hand bag, and she stated this note was signed by a person she had known in Alaska; that the note had been executed a great many years before, and had been kept up to date by the payment of interest; that he asked Mrs. Schafer if it would not be a nice thing to remem-

ber this old friend by canceling this indebtedness, and she replied, "No, I want every last cent of interest paid; I want all of that indebtedness paid on the note, and I do not want any of it to be given." Mr. Stedman further stated:

"I inquired of her in regard to her relatives, and if she didn't wish to leave any of her estate to her relatives, and she was very short in her answers. She didn't wish to speak of her relatives, and said 'No, she didn't feel close to her relatives, and didn't wish to leave anything to them.' "

The will was prepared the next morning in Mr. Stedman's office, from the information furnished by Mrs. Schafer.

Mr. Stedman further testified that Mrs. Schafer stated she wanted all her estate to go to Mr. Moe; that Mr. Moe had been very considerate of her with everybody else; that she knew some were only intent on getting money from her, and he was the only one that did not want to get money from her, and therefore she wanted him to benefit from it; that Mrs. Schafer said she had known Mr. Moe for some time; that she had known his mother, and since his mother's death, he had really been a son to her; that really the relation of mother and son had existed between them, rather than friends; that Mrs. Schafer further informed him she wanted Mr. Schloeman to act as executor, because she felt he was disinterested and would be entirely fair, and that he had had business experience and could properly take care of the estate.

It further appears from the testimony of Mr. Stedman that, after the will was prepared, he took it to the hospital, and Mr. Olsen, an accountant at the hospital, was called to witness it with Mr. Stedman, and that Mr. Olsen and Mr. Stedman were the only persons in the room with Mrs. Schafer; that the will was

read to Mrs. Schafer, paragraph by paragraph, and after it was read, Mrs. Schafer was asked if that was the way she wanted it, and she said "Yes, that is the way I wish it." The witness continued:

"Then after reading the entire instrument I asked her if that expressed the wishes as she wanted her will to be, and she said 'Yes; this is the only time I have ever been able to have a will the way I really wanted it.'"

Mr. Stedman testified that Mrs. Schafer signed the will, and he and Mr. Olsen witnessed it; that, after the business was concluded, he started to shake hands with Mrs. Schafer, and she kept holding his hand and stated:

"Now I feel that a load is off my mind; this is the way I want it; this is the way I wanted it for some time; I certainly feel content, I feel as though everything will be the way I wish it."

Mr. Stedman further testified that Mrs. Schafer was in full possession of her mental faculties, knew what she wanted to do, and insisted that it be done the way she wished it; that the will was left in the hospital safe until after Mrs. Schafer's death; that Mrs. Schafer did not seem to contemplate that she was on the verge of death, as she spoke of what she was going to do when she got up and could get around.

Mr. Olsen, business manager for the Swedish hospital, testified he was called by Mr. Stedman to witness the will; that he had not known Mrs. Schafer previously. This witness corroborated Mr. Stedman as to what took place at the time the will was executed, and as to the statements made by Mrs. Schafer. He stated that he watched Mrs. Schafer sign the will, and that her handwriting was legible; that Mrs. Schafer talked quite a good deal, and seemed cheerful and interested in what was going on. Mr. Olsen thought

Mrs. Schafer had Mr. Stedman read over twice the following provision of the will:

"I do not make any bequests to my relatives for the reason that I do not feel close to any relative and in the event that any such relative, or any other person, shall contest this my last will and testament, then and in that event I give to such person so contesting, the sum of One Dollar ($1.00) and no more."

Mr. Moe was named as the principal beneficiary in this will.

Mr. Schloeman, executor of this will, is the credit manager of the Swedish hospital, and had not known Mrs. Schafer before she came to the hospital. He testified that he met and talked with her in connection with her bill, after she came to the hospital. In answer to a question by the court as to why Mrs. Schafer wanted him to act as executor, Mr. Schloeman answered that, at the time she asked him to act as executor, she went into quite a lengthy discussion about having had other wills drawn which were not satisfactory, and that she desired to draw up another will, asking Mr. Schloeman if he was acquainted with a reliable attorney who could handle the affair for her; that he told Mrs. Schafer they considered their hospital attorney very good, whereupon Mrs. Schafer asked him to get Mr. Stedman, so she could draw this new will; that he then called Mr. Stedman; that Mr. Moe had told him that Mrs. Schafer had relatives, but he did not know their addresses; that Mr. Schloeman got this information from Mrs. Knox.

In regard to this third will, while it is true that Mr. Moe undoubtedly had the opportunity to influence Mrs. Schafer, there is not a scintilla of evidence that he had anything to do with procuring this will to be drawn, in the naming of the executor, or in the selection of the attorney who drew the will. The con-

tention of appellant in this case is based very largely upon the fact that, in the will here in question, Mr. Moe was made the principal beneficiary instead of Nancy King.

It may be admitted that Mr. Moe saw a great deal of Mrs. Schafer the last three or four years of her life, and that he was very attentive to her after she was taken to the hospital, but we have been unable to find in this association anything other than opportunity; in other words, there is no direct testimony that Mr. Moe ever, by word or act, attempted to suggest anything in regard to the execution or the provisions of any of the three wills.

We now desire to refer briefly to some of the other incidents which appellant contends show undue influence on the part of Mr. Moe. We have already referred to the coal incident, and we shall next discuss a statement claimed to have been made by Mr. Moe at the time Warren Brown was drawing the second will. Miss Haines and Mrs. Meyer testified that, while they were in the hall, during the time Mr. Brown was drawing this will, Mr. Moe was talking about wills and people passing away, and he stated that his mother had passed away and that he didn't get any of her estate, and that it was not going to happen this time. Mr. Moe denied making any such statement.

When we consider that Mr. Moe had nothing to do with the first will and did not know its contents, and had nothing to do with calling Mr. Brown to draw the second will and knew nothing about what its provisions might be, it is difficult to understand why he would make such a statement as it is claimed he made. It is certainly apparent that any influence he may have had on Mrs. Schafer, if he did have any, did not affect her, in so far as the Brown will was concerned. It should also be kept in mind that Miss Haines was the

person who called Mr. Brown, and who was named as executor of that will. Mrs. Meyer, who also testified to the above statement, had some jewelry which she claimed Mrs. Schafer had given to her, and this jewelry Mrs. Meyer refused to turn over to the executor until after a suit was instituted by Mr. Stedman to recover it, after which she turned it over to Mr. Stedman. The trial court certainly had the right to consider these matters in connection with the testimony of the last named witnesses relative to this incident, as well as other incidents in regard to which they testified.

We next come to what appellant refers to as the "Casket Incident." It appears from all the testimony that Mrs. Schafer was very positive in her desire to be buried in a metallic casket. Under this heading in appellant's brief, we find this statement:

"This incident is highly important not only because it indicates the length to which Mr. Moe went in falsifying to Mrs. Schafer, but also because it appears to have been the direct cause for Mrs. Schafer's immediately thereafter changing her will and leaving everything to Mr. Moe."

It will be remembered that, after the second will was drawn, it was given to Miss Haines, together with the destroyed will drawn by Mr. Seijas, and that Miss Haines kept these wills until requested by Dr. Hill, at the instance of Mrs. Schafer, to bring them to the hospital. Miss Haines stated that, at the time she returned the wills, Mrs. Schafer said she wanted to look at them. The statements claimed to have been made by Mr. Moe, to which reference will now be made, apparently occurred before Miss Haines returned the wills to Mrs. Schafer, so it does not appear that Mr. Moe knew what either will contained. Miss Haines testified that Mr. Moe came in and stated that Mrs. Schafer was very ill, and that he thought something should be done

about her casket. Miss Haines stated that "Mrs. Schafer had said very plainly many times that she wanted a thousand dollar metallic casket," and that Mrs. Schafer had said to her, "I want you to pay that for it"; that Mr. Moe came down and said he thought that should be taken care of at that time; and that she said she thought "we had better let her die before we begin buying a casket."

In answer to a question regarding this conversation, Mr. Moe testified:

"That was on Sunday. Mrs. Schafer told me to be sure to go down there on Monday and find out from Miss Haines if she had put that in the will about the casket and about the funeral arrangements in case she passed away. She wanted to be sure that was in. So I went down and asked Miss Haines—I said, 'She wants that metallic casket; I have got notes in my log book to that effect, a memorandum,' and she said to me 'You know a metallic casket is understood,' and I says, 'Is it in the will?' and she says, 'It is just understood.' So that is all I asked her about it."

No mention of a metallic casket was made in the second will.

Mrs. Meyer testified that she was present at the hospital, and heard Mr. Moe talking to Mrs. Schafer about Miss Haines and the casket. Mrs. Meyer stated:

"Well, he [Mr. Moe] said he went down to the bank to see Miss Haines and he told her that she was pretty low, and he told Mrs. Schafer that Miss Haines said, 'Oh, I am going to get my coat and go out and do some shopping; I am going to shop for a casket,' and Mr. Moe said that he said 'Well, now, wait a minute, let us leave her die first, before we do any shopping.'"

The witness, when asked if Mrs. Schafer said anything about this conversation, answered: "She said 'Isn't that terrible, they want to bury me before I am dead.'" Mr. Moe denied making any such statement to Mrs. Schafer.

In view of the importance which Mrs. Schafer seemed to place upon a metallic casket, it does not seem strange that she should request Mr. Moe to ask Miss Haines (who had the will) whether or not the will provided for such a casket. Whether or not Mr. Moe thereafter made the statement to Mrs. Schafer which Mrs. Meyer claims he made, is in dispute.

It is difficult for us to see how Mr. Moe could have had in mind the purpose which appellant argues he did, even conceding he made the statement to Mrs. Schafer. At most it could have affected only Mrs. Schafer's feeling toward Miss Haines, and could have had no bearing on her attitude towards Mrs. King, the beneficiary. In addition, it does not appear that Mr. Moe knew who was executor of this will, or who were devisees under it, so we say it is difficult, under this record, for us to believe that Mr. Moe had any such purpose in mind at that time.

As to the contention that this incident was what caused Mrs. Schafer to draw another will, we are unable to agree with appellant. There is ample testimony to the effect that Mrs. Schafer, for various reasons, was dissatisfied with the first will, among those reasons being that the will did not contain her wishes, but those of Mr. Seijas; and that the second will did not express her desires, but was Miss Haines' idea. Especially was she concerned that the second will did not contain a provision relative to the metallic casket.

It is claimed in this case that the undue influence exerted by Mr. Moe was such as to cause Mrs. Schafer to change the beneficiary in her will and make Mr. Moe the principal devisee, instead of Mrs. King. May we say at this point, there is no testimony by any witness that Mr. Moe ever said one word against Mrs. King, nor, in our opinion, is there any act of Mr. Moe from

which it could be inferred that he ever attempted to influence Mrs. Schafer against Mrs. King.

It is further contended that Mr. Moe influenced Mrs. Schafer against her friends. Mrs. Meyer testified that Mr. Moe told Mrs. Schafer that her friends were not interested in her for anything but her money, and Mrs. Knox testified that, before Mrs. Schafer went to the hospital, she told Mrs. Knox that Mr. Moe talked against her friends. However, not one of these witnesses claimed that Mr. Moe ever said a word against Mrs. King. Some of these alleged statements were purportedly made before any will was made, and, conceding that they were made, it is apparent that Mrs. Schafer did not regard them seriously, as she named Nancy King in both the first two wills drawn.

It is further contended that Mr. Moe did not tell Mr. Stedman the names and addresses of Mrs. Schafer's relatives. This failure on the part of Moe, if it was a failure to do something which he was bound to do, occurred after Mrs. Schafer's death, and of course could have no effect on the will. However, both Mr. Stedman and Mr. Schloeman testified that Mr. Moe told them that Mrs. Schafer did have relatives, but that he did not know, or was not sure of, their addresses. It appears without contradiction that Mrs. Schafer did not want her relatives to know that she was going to the hospital, but nevertheless Mrs. Wolfe did notify Mrs. King by wire and air mail that Mrs. Schafer was going to the hospital, and Mrs. Meyer notified Mrs. King by wire the day before the funeral.

There were other witnesses testifying in this case, but those we have mentioned were the principal actors in the transactions referred to. We should mention the testimony of Dr. Rickles, called as a rebuttal witness for appellant. The doctor, in answer to a hypothetical question, which included Mrs. Schafer's age,

the opiates administered to her, and the operation which was performed upon her, testified in substance that, in his opinion, these conditions would have a tendency to undermine her strength and resistance, and therefore, would affect her mind as well as her body, and that it would be easier to influence such a person than it would to influence one in a normal condition. The doctor was interrogated to some considerable length about the effect of opiates and other conditions. While we do not question the qualifications of Dr. Rickles, it must be borne in mind he did not see Mrs. Schafer, and we cannot be greatly influenced by his testimony, in view of the fact that there is so much direct evidence given by those who saw and talked with Mrs. Schafer, including Dr. Hill.

In summing up all the testimony herein, we have about this situation: Here was an old lady, eccentric and strong minded, especially in regard to money matters, who had lived alone for many years, and who had not seen any of her relatives since 1929. She was strong in her likes and dislikes. She met Mr. Moe, who apparently showed her every consideration, and a friendship was formed which ripened into an affection, as expressed by one witness, like the relation of mother and son. There is ample testimony to support the conclusion that this relation continued up to the time of Mrs. Schafer's death. We cannot say what may have caused Mrs. Schafer to change the beneficiary from Mrs. King to Mr. Moe. It may have been the consideration shown her by Mr. Moe during the time she was in the hospital, when she would especially appreciate kindness, such as the giving of his blood for a transfusion; it may have been for some reason known only to herself that she no longer felt close to her niece and sister; but, whatever the reason may have been, we are satisfied that, at most, the

opportunity which Mr. Moe had to influence Mrs. Schafer was not sufficient to create more than a suspicion of undue influence, and we are further satisfied that there was ample testimony to overcome any such suspicion and to sustain the judgment.

Especially applicable to the instant case is the following quotation from *In re Patterson's Estate, supra*:

"To vitiate the will an influence must be shown which, at the time of the testamentary act, controlled the volition of the testator, deprived him of free will agency, and prevented an exercise of his judgment and choice. He may have been subjected to counsel, suggestion, persuasion or even importunity, yet if it be shown, as in this case, that he had testamentary capacity, and at the time of making the will was free and unrestrained in exercising his volition it cannot be held that undue influence has been shown."

Being satisfied that the judgment is sustained by the great preponderance of the testimony, and on the authorities hereinbefore cited, the judgment of the trial court must be and is affirmed.

ROBINSON, C. J., MILLARD, and SIMPSON, JJ., concur.

BEALS, J. (dissenting)—Like many will contests, this case presents a question difficult to decide. During the latter part of November, 1939, Anna Schafer, then eighty years of age, and suffering from an incurable internal cancer, was taken to the hospital for treatment. December 2nd, at her request, her attorney visited her and prepared a will, which she executed. By this will, she made several small bequests to friends, bequeathed a one hundred and ten dollar note of doubtful value to Melvin A. Moe, respondent herein, made a substantial bequest to the Catholic Church of the Sacred Heart, and left the entire remainder of her estate to her niece, Nancy W. King. She also provided

for her funeral, directing that she be buried in a metallic casket.

Almost immediately after executing this will, she expressed dissatisfaction with some of its terms, particularly with the executor named, and the next day requested Miss Grace Haines, her friend and an employee of Mrs. Schafer's bank, to bring an attorney to the hospital to prepare another will. Miss Haines complied with this request, and the attorney promptly called on Mrs. Schafer and prepared a second will, at Mrs. Schafer's direction. By this will, the testatrix bequeathed to Mr. Moe the note she had left him in the previous will, her radio, and the proceeds to be derived from her automobile. She made a bequest to her friend Mrs. Marion Jackman; she bequeathed to the Sacred Heart Church one of her bank accounts and her household furniture, with the exception of a cedar chest; she bequeathed an article of jewelry to her friend Mrs. Harry Denny, and to her friend Mrs. Rose Meyer all of her jewelry which was then in Mrs. Meyer's possession; bequeathing all the remainder of her estate to her niece, Nancy King, providing that, if Mrs. King should not be living at the time of Mrs. Schafer's death, the residue of the estate should go to the Sacred Heart Church. She appointed Grace Haines executrix without bond.

While Mrs. Schafer had not seen her sister, Mrs. King's mother, nor Mrs. King herself for some time, the record is replete with evidence that Mrs. Schafer was devoted to her sister and had a great affection for her niece.

Under this will, the only interest in the matter on the part of Miss Haines was that she was named as executrix thereof, and for services as such she would, of course, receive some small compensation. This second will was prepared and signed on Sunday,

December 3rd, and while Mrs. Schafer and the attorney who was then representing her were in the room in the hospital which Mrs. Schafer was occupying, respondent Moe, Miss Haines, and Mrs. Meyer were together in another portion of the hospital. Miss Haines testified that, during this period of waiting, Mr. Moe manifested considerable nervousness, and said something concerning his mother's or his parents' estate, to the effect that "he had been beat out of that estate, but he didn't intend to let this happen this time —to let it happen this time."

Mrs. Meyer testified concerning the same incident, that, on the occasion referred to, Mr. Moe was talking about wills and kindred subjects, and said that "his mother had passed away and that he didn't get any of her estate, and it was not going to happen this time."

Miss Haines testified that, at some later date, she called on Mrs. Schafer at the hospital, taking with her the will which Mrs. Schafer had given her to keep, and that Mrs. Schafer then appeared to be unhappy, complaining that her friends were not playing fair and were not being honest with her.

The will of December 3rd contained no reference to the expensive metallic casket in which Mrs. Schafer desired to be buried. Evidently she had expressed this wish to Miss Haines, however, and the latter understood Mrs. Schafer's desire. Of course the amount of expense incurred in Mrs. Schafer's funeral was entirely immaterial to Miss Haines, who was not a beneficiary under the will.

Miss Haines also testified that, at some date which she could not fix exactly, Mr. Moe called at the bank and informed Miss Haines that Mrs. Schafer was very ill, and that he thought something should be done regarding the casket in which she was to be buried. Miss Haines testified that she told Mr. Moe that she

thought the matter had better be left until Mrs. Schafer's decease. This conversation was prior to Miss Haines' visit to Mrs. Schafer above referred to. Miss Haines testified that, on this latter occasion, Mrs. Schafer complained to her that "some friend was trying to bury her before she had died." It was shortly after Miss Haines' visit that Mrs. Schafer destroyed the will of December 3rd.

Mrs. Meyer testified that, upon the occasion of a visit which she paid to Mrs. Schafer, Mr. Moe was present, and in the presence of the witness, told Mrs. Schafer that he had called on Miss Haines and told her that Mrs. Schafer was very sick and that Miss Haines then said, "Oh, I am going to get my coat and go out and do some shopping; I am going to shop for a casket," and that Mr. Moe told Mrs. Schafer that he had then said, "Well, now, wait a minute, let us leave her die first, before we do any shopping." Mrs. Meyer testified that Mr. Moe also said to Mrs. Schafer that he knew what Miss Haines' angle was, that she wanted to go to a certain undertaker and buy a casket at wholesale, whereupon the witness, Mrs. Meyer, said that she did not understand this, because it would be immaterial to Miss Haines, whereupon Mr. Moe replied that Miss Haines could sell the casket to the estate for the full amount. Mrs. Meyer testified that Mrs. Schafer heard all this conversation, and that she said, "Isn't that terrible, they want to bury me before I am dead."

Mrs. Meyer also testified that, on one occasion when the witness, Mr. Moe, and Mrs. Schafer were together in the latter's room in the hospital, Mr. Moe said to the witness that he wanted her to go with him to the bank and procure Mrs. Schafer's will from Miss Haines, and in reply to a question by the witness as to why he should want to do that, Mr. Moe said that he thought Mrs. Schafer should have the will, and upon a renewed

query by the witness as to the purpose of procuring the will, Mr. Moe said, "How do we know Miss Haines and Mr. Brown might not change the will?"—all this in the presence of Mrs. Schafer.

Mr. Moe admitted meeting Miss Haines at the hospital on the afternoon of the Sunday Mrs. Schafer made the second will, but denied making the statements testified to by Miss Haines and Mrs. Meyer. He testified that later Mrs. Schafer said that she wanted her wills back "because they were very dissatisfactory to her. She thought they were, because she had not read them over." He testified that Mrs. Schafer was dissatisfied with the wills, saying that they embodied the ideas of different people, and that they were not her ideas. Apparently these remarks were addressed particularly to the first will, drawn on December 2nd. As to the will of December 3rd, Mr. Moe testified that Mrs. Schafer said that that will embodied "more or less Miss Haines' ideas, and she did not know if they were right or not." It does not appear that Miss Haines ever discussed the provisions of the will with Mrs. Schafer, either before or after the will was drawn.

Concerning his conversation with Miss Haines at the bank, regarding the casket, Mr. Moe testified that, at Mrs. Schafer's request, he called on Miss Haines to ask if the provision for the metallic casket was in the will of December 3rd, and that Miss Haines said to him, "You know a metallic casket is understood." Mr. Moe denied that he ever said to Mrs. Schafer that Miss Haines and Mr. Brown might change her will, or that he had told Mrs. Schafer that Miss Haines had said that she was going shopping for a casket. Mr. Moe testified that, when he told Miss Haines at the bank that Mrs. Schafer was very ill and that she wanted a Catholic undertaker to arrange for her funeral, Miss

Haines said, "She is not such a strong Catholic as all that," the witness testifying that Miss Haines then said that

" . . . she would take care of everything and that she would go out and see about that, and that is the last, just turned around and walked out. In fact, she went and got her coat and left me standing there. There was nothing more for me to do but walk out."

After careful consideration of the entire record, I am convinced that Miss Haines' testimony is true.

Respondent Moe attacks Mrs. Meyer's testimony, saying that she was influenced against him by the fact that the administrator had demanded from her certain articles of jewelry which Mrs. Schafer had admittedly turned over to Mrs. Meyer, and which Mrs. Meyer stated that Mrs. Schafer had given to her. Mrs. Meyer, without resistance, complied with an order that these articles be turned over to the executor. By the will of December 3rd, Mrs. Schafer bequeathed these articles to Mrs. Meyer, stating that they were in her possession. Under all the circumstances, I am of the opinion that Mrs. Meyer's testimony is entitled to credence.

Nellie Reed, testifying on behalf of Mr. Moe, stated that she first met Mrs. Schafer in 1936, and that over two years before Mrs. Schafer's death, the latter introduced Mr. Moe to the witness, saying, "This is my son, my boy, the truest friend I ever had, and when I pass on everything is to go to him." Mr. Moe testified that he first learned that Mrs. Schafer wanted to leave everything to him when the attorney who prepared the will here under attack entered the hospital room. It is of some significance to note that Mr. Moe remained in the room with Mrs. Schafer and the attorney while she gave instructions for the preparation of this will. When Miss Reed's testimony was called to his atten-

tion, Mr. Moe testified that Mrs. Schafer had previously, on various occasions, said that she was going to remember him in her will.

Ida Forlefer, called by Mr. Moe, testified that she had known Mrs. Schafer for two years, and for ten months rented a room from her and saw her every day. She stated that Mrs. Schafer had mentioned her niece Nancy, saying that she did not want anything to do with her, that Nancy had not treated her right. At the same time she spoke to the witness of sending Nancy a handsome bedspread which had been made for Mrs. Schafer, valued at approximately fifty dollars. The witness testified that Mrs. Schafer was more bitter against her niece Nancy than her other relatives, saying that she would not give Nancy a postage stamp, at the same time proposing to send her the handsome bedspread.

Henrietta Forhan, called by Mr. Moe, testified that she was a fellow patient with Mrs. Schafer at the hospital for a while, occupying the same room. She stated that Mrs. Schafer expressed much dissatisfaction with the first will which she had executed, but expressed no dissatisfaction with the second will.

It appears that Mr. Moe was with Mrs. Schafer when the latter called Mr. Schloeman, whom she named as her executor, to her room, and asked him to procure an attorney to prepare a will. Mr. Moe was also present when the attorney brought the will which he had prepared for execution by Mrs. Schafer, and left the room only when instructed by the attorney to do so.

Mrs. Schafer was eighty years old, suffering from cancer of the uterus and adjacent organs. She was, of course, in pain, and was given opiates. In the first two wills which Mrs. Schafer executed, she remembered certain of her friends with small legacies, gave a substantial bequest to her church, and the balance of her

property to her niece. By the will now under attack, executed three days before she died, Mrs. Schafer left her estate to respondent Moe, who in her other wills had been left only a comparatively small bequest. Mr. Moe admitted that Mrs. Schafer had, over several years prior to her death, at times stated that she would remember him in her will. His "expectations" then had been aroused. The record convinces me that Mr. Moe, when Mrs. Schafer was taken to the hospital, entered upon a vigorous campaign in an endeavor to realize his hopes. In the course of this campaign, he was ruthless and unscrupulous, and I am convinced, told Mrs. Schafer deliberate untruths, in an endeavor to alienate her from some of her friends, and cause her to destroy the will of December 3rd. That was the first step toward procuring the execution of a will more satisfactory to Mr. Moe, and, in my opinion, taints at its source the will of January 13th, which, in my opinion, should be held to have been procured through undue influence exerted by Mr. Moe over an aged lady, dying of cancer, and who for weeks had been given opiates to alleviate her suffering.

In view of the testimony of Mrs. Schafer's physician, it cannot be said that, at the time she made the will of January 13th, she lacked testamentary capacity. No criticism whatever attaches to the attorney who prepared the will of January 13th, he having simply responded to Mr. Schloeman's request, and prepared the will, pursuant to Mrs. Schafer's directions.

For the foregoing reasons, I am constrained to dissent from the opinion of the majority.