THOMPSON *v.* HAWKS and others.

*(Circuit Court, D. Indiana. January, 1883.)*

WILL—UNDUE INFLUENCE—SPIRITUALISM.
      Where a testator embraced spiritualism as practiced by his beneficiary, who claimed to be a spirit-medium, and instead of merely believing in it as an abstract proposition, the testator became possessed of it and suffered it to dominate his life, and where his belief in spiritualism was artfully used by the beneficiary to alienate him from his only son and child and to get his property, *held,* that a will made in such a mental condition and under such influences should be set aside.

*John H. Stotsenburg* and *D. C. Anthony,* for plaintiff.
*A. Dowling* and *La Follette & Tuley,* for defendants.

GRESHAM, D. J. John Thompson died in Louisville, November 14, 1877, aged 76 years, leaving a will, which was executed February 25, 1875, in New Albany, by the terms of which he bequeathed all his property to Mrs. Amanda E. Hawks, who is one of the defendants. George Thompson, the plaintiff, is the only child of the testator, and brings this suit against Mrs. Hawks and her husband to set aside the will on account of the mental incapacity of the testator, and the undue influence over him of the devisee. The reasons assigned by the

testator in his will for disinheriting his son are the neglect of the testator during the last illness of his second wife, and during his own illness in the winter of 1873, and the circulation of injurious reports concerning him by his son. Without stopping to detail the testimony, or the relations of the father and son for several years previous to the death of the former, it is sufficient to say that the accusations in the will against the son seem to have been the result of a delusion. Whatever disagreements there may have been between them, their relations are not shown to have been so inharmonious as to account for the strange and unnatural disposition which the father attempted to make of his property.

Mrs. Hawks knew the family of John Thompson as early as 1856. For some time she lived near them and under the same roof in New Albany. In 1860 she removed to Louisville. The friendly relations between herself and the Thompson family continued after her removal, and when the second wife of the testator died and when he became sick, she visited their house frequently and attended to their and his wants. Some time after 1870, Mrs. Hawks became what is known as a spirit medium, and the testator became much interested in spiritualism, and visited her often and regularly Previous to that time, and during visits in Iowa, he had exhibited signs of mental aberration in his intercourse with his relatives and acquaintances there. He had a sister and niece who were deranged and in insane asylums. Mrs. Hawks made him acquainted with the mysteries of spiritualism; she undertook to "develop" him, and enable him to become a medium who could communicate directly with the spirits of the dead. He began to talk among his acquaintances about sending and receiving messages to and from his deceased wives. He endeavored to obey sedulously every trivial injunction that he received in this way from them, even to keeping the cow away from the rosebushes in his yard. He carried a little basket on his arm on his visits to Mrs. Hawks, in which he told some of the witnesses he was taking coffee and delicacies to Mrs. Hawks for his deceased wives, which Mrs. Hawks would forward to them, and at least one of these visits was made in the same month that the will was executed. He began to talk freely about disposing of his property to keep it out of his son's hands, and about disinheriting his son, although, strange to say, Mrs. Hawks testifies that nothing on these subjects ever passed between them, notwithstanding their great intimacy. On January 29, 1874, he did convey his real estate in New Albany to Mrs. Hawks, for the consideration of $2,800, which she says she paid him

in money in the recorder's office in New Albany. There is no other witness of the payment. She was then the wife of a poor shoemaker, with two children, 16 and 17 years old. She says that her husband had inherited $500 of this sum, and she had a legacy, the amount of which is not stated. On July 28, 1875, she obtained a quitclaim deed from the testator to the same property, for which she paid $50. On January 7, 1876, she reconveyed this property to the testator for $2,900.80, taking his notes for $1,652.30, secured by mortgage on the property, and receiving the balance in money. She gives as the reason for the reconveyance that having failed in two lawsuits against George Thompson, for having erected buildings on the ground adjoining hers, which darkened her windows and damaged her property, she became dissatisfied with it, and the testator took it back to please her, at the price mentioned. But it is also worth mentioning, that between the original conveyance to her and the conveyance back to the testator he had made his will leaving everything to her.

Before and after the conveyances to Mrs. Hawks, and the execution of the will, the testator informed several persons that he had been directed by the spirits of his deceased wives, through Mrs. Hawks, to dispose of his property; that he had been advised by them that it was necessary for his development to do so; and that he had received sundry warnings against his son, and injunctions to "do well by" Mrs. Hawks, from the same source. Numerous acts of eccentricity are detailed by the testimony, which it is useless to recapitulate. There is some evidence tending to show that the husband of Mrs. Hawks was addicted to drink, and was unable to provide his family with the commonest necessaries of life; that Mrs. Hawks expected to inherit a fortune from the testator; and that he had money and bonds which have not been discovered since his death. The general agreement of all the plaintiff's witnesses—of those in New Albany, in Ohio, in Kentucky, and in Iowa—is a strong corroboration of the testimony of each of them. Several credible and disinterested witnesses, with good opportunities for estimating the mental condition of the testator, testify that they think he was sane, but they never observed those acts which impressed other witnesses with a different belief, and their testimony ought not to outweigh the positive testimony of those who were cognizant of unmistakable evidences of a disordered mind.

It is useless to discuss here the proposition as to whether or not a spiritualist can make a valid will, or as to whether or not a man who has a monomania on one subject is capable for the general trans-

action of business which does not concern that subject. The testator was in a weakened state of mind when he came under the influence of a spirit medium. He embraced spirtualism as practiced by the spirit medium, and instead of merely believing in it as an abstract proposition, he became possessed by it and suffered it to dominate his life and override every other consideration. His belief in it was artfully used by the spirit medium—the only one, it appears, whom he ever consulted—to alienate him from his only son and child, and to get his property.

A will made in such a mental condition and under such influences ought to be set aside.

Finding and judgment for the complainant accordingly.

---

PRESUMPTION OF UNDUE INFLUENCE. The law presumes that undue influence has been used where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relationships exist. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof besides the *factum* of the will is required.(*a*) This rule applies with peculiar force to wills made in favor of the testator's priest, confessor, clergyman, or spiritual adviser.(*b*) The burden of proof is upon those seeking probate of such a will to show that such presumed influence did not in fact or in any degree induce the giving of the legacies.(*c*) Direct proof of undue influence is not required; it may be inferred from circumstances.(*d*) But where a testatrix, who was a Roman Catholic, bequeathed the bulk of her property to a Roman Catholic priest, who had been for many years her confessor, and who had resided in her house, it was held that it was incumbent on those who pleaded undue influence to show it affirmatively; that it could not be presumed merely from the relations between them and the bequest.(*e*) It was said, in the case last cited, that the doctrine of undue influence adopted in courts of equity in regard to gifts *inter vivos* (*f*) did not apply to the making of wills; that the natural influence created by the relations of parent and child, attorney and client, confessor and penitent, etc., was not held to be undue by the court of probate, but might lawfully be exerted to obtain a will or legacy, as long as the testator thoroughly understood what he was doing, and was a free agent. In another English case it was said that a strong case must be made out to set aside a will for undue influence, but that where a

(*a*) Marx v. McGlynn, 88 N. Y. 357.

(*b*) Id.; Thompson v. Heffernan, 4 Drury & War. 285.

(*c*) St. Leger's Appeal, 34 Conn. 434, 450.

(*d*) Drake's Appeal, 45 Conn. 9.

(*e*) Parfitt v. Lawless, 2 L. R. P. 462; 41 L. J. P. 68; 27 Law T. (N. S.) 215; 21 W. R. 200.

(*f*) Gift to Methodist preacher, Norton v. Relly, 2 Eden, 286; spiritual medium, Lyon v. Home, L. R. 6 Eq. 655; donatio mortis causa to clergyman, Thompson v. Heffernan, 4 Drury & War. 285. And see Nottidge v. Prince, 2 Giff. 246.

person, acting as the spiritual adviser of a testator, takes advantage of that situation to become the agent and manager of the testator's temporal affairs, and while holding those opposite characters becomes a donee of very large gifts under the testator's will, there is a strong ground made out for inquiry as to undue influence.(g)

Such presumption may arise, although the one occupying such a relation to the testator is not a devisee or legatee. Thus, the rector of a church, which was residuary legatee and had the nomination to two scholarships created by the will in a theological seminary, who superintended its execution, and was named therein as sole executor, was held to be so interested in the will as to raise a presumption of undue influence, and to require proof of spontaneity and volition—affirmative proof on the part of the executor of good faith, and a proper use of the confidence placed in him.(h)

The presumption is one of fact, and if the will is fairly made the law does not condemn it.(i) The earnest presentation to a testator by a spiritual adviser of proper arguments and the enforcement of motives, whereby the intellect is persuaded and the conscience quickened, are declared in *Merrill* v. *Rolston*(j) to be legitimate influences, and the results praiseworthy, where they do not violate natural obligations.

RELIGIOUS DELUSIONS—SPIRITUALISM. Proof that the testator held peculiar religious beliefs does not establish his incompetency to make a will. Thus, where the testator believed there were degrees in heaven, and that his pre-eminence there depended materially on the amount of property he acquired and the charitable purposes to which he appropriated it, it was held that the will might be valid; that the jury were properly instructed that if they believed that the testator was under the belief that the doing of some great charitable deed would advance him to a high state in heaven, and that the delusion was so absurd and visionary as to amount to insanity, and that he executed the will under its influence, it would be sufficient to avoid it.(a)

A belief in spiritual communications is not *ipso facto* an insane delusion, rendering the believer incapable of making a valid will.(b) In the case cited, the testatrix believed that by means of spiritual communications her deceased husband had either dictated the will or expressed his approval of its provisions, and she also believed that the husband of her only child was possessed of a familiar demon, that enabled him to control his wife's affections and alienate them from the testatrix. The decree admitting the will to probate was affirmed, the court holding that it was for the jury to determine whether this belief had brought her to the state of unsoundness of mind by reason of insane delusions, and whether such delusions operated upon her in making the will. Her belief that her husband had dictated the will did not show undue influence—that it was the will of another overriding her own. If she yielded her own will and judgment, exercising no free agency, then it was not her will, but another's, as much as if actually dictated by a living person; but if

(g) Middleton v. Sherburne, 4 Younge & C. 358. Compare Huguenin v. Basely, 14 Ves. 273.
(h) In re Welsh, 1 Redf. 238; S. C. 1 Redf. Am. Cas. on Wills, 506.
(i) Marx v. McGlynn, 88 N. Y. 357.

(j) 5 Redf. 220.
(a) Gass v. Gass, 3 Humph. 278. See, also, Weir's Will, 9 Dana, (Ky.) 434; American Bible Society v. Stover, 12 Weekly Dig. 213.
(b) Robinson v. Adams, 62 Me. 369.

she acted her own will and judgment, and did not abandon both to the supposed wishes and opinions of her husband, there was no undue influence, although the testatrix might have had full faith in the supposed communications, and have regarded them as her husband's advice. The same rule as to undue influence of this kind was applied in another case, where the will of a spiritualist was upheld, although he believed that he had received, through spirit mediums, communications from his deceased wife, had consulted mediums concerning his business and proposed inventions, and had engaged in speculation on advice from such sources. It appeared that he believed in two kinds of spirits,—some that would deceive him and others that were reliable, —and that if the advice accorded with his own judgment, he believed it came from the latter class, and followed it; but if it did not accord with his judgment, he believed it came from the former class and disregarded it. The court said: "He brought them all to the test of his judgment and acted accordingly. It is difficult to find evidence of insane delusion, or any peculiar exposure or liability to undue influences, in a faith thus absolutely subordinated to the judgment."(c)

Where, as in the principal case, the spirit medium is a beneficiary under a will made in accordance with such communications, the burden is upon those seeking its probate to show that it was the voluntary and well-understood act of the testator's mind. From such a relation, the exercise of dominion and influence by the medium over the mind of the testator is implied.(d)

WAYLAND E. BENJAMIN.

(c) Smith's Will, 52 Wis. 543.          (d) Compare Lyon v. Home, L. R. 6 Eq. 655.