[No. 12509.   Department Two.   August 31, 1915.]

## In the Matter of the Estate of NANCY HANSON.

### FREDERICK W. HANSON, *Appellant*, v. B. H. RHODES, *as Executor etc., Respondent*.[1]

WILLS — TESTAMENTARY CAPACITY — PRESUMPTIONS — BURDEN OF PROOF.  Testamentary capacity is presumed where a will, rational on its face, is shown to have been executed in legal form by the testimony of the subscribing witnesses; and the burden of overcoming the presumption by competent proof is upon the contestant.

SAME—EVIDENCE OF SANITY—BELIEF.  A belief in spiritualism is not necessarily evidence of want of testamentary capacity.

SAME—SANITY—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.  Evidence that the testatrix believed in spiritualism and that she had consulted the spirit of her husband in making her will is insufficient to show that she was acting under the influence of an insane delusion, where there was no evidence that the terms of the will or the subjects of her bounty were traceable to the belief, or that it had influenced her to make a will which otherwise she would not have made.

Appeal from a judgment of the superior court for Lewis county, Clifford, J., entered October 7, 1913, upon findings in favor of the defendant, dismissing a petition to set aside a will, tried to the court.  Affirmed.

*Vanderveer & Cummings* and *F. W. Crary*, for appellant.

*B. H. Rhodes* and *C. D. Cunningham*, for respondent.

ELLIS, J.—This is a proceeding by petition in probate to set aside a will.

Nancy Hanson died in Centralia, Lewis county, Washington, June 17, 1910, aged about seventy-nine years.  She left two sons, her only surviving heirs, John H. Hanson, since deceased, and Frederick W. Hanson, the petitioner.  She left an estate, as shown by the inventory, approximating $38,000, consisting of about $18,000 in real estate and $20,000 in

[1]Reported in 151 Pac. 264.

personalty, the latter being cash and securities. On June 20, 1910, as proponent, the executor named therein, filed in the superior court of Lewis county, and caused to be probated, a document purporting to be the last will and testament of the deceased.

The will, after the usual provisions for burial, payment of debts and funeral expenses, devised to her son Frederick W. Hanson real estate of the appraised value of $13,000; to her granddaughter May Vankirk Hurn (now deceased) and her husband, Benjamin F. Hurn, real estate of the appraised value of $1,800; to her three grandchildren Henry, Nancy and Helen, all minors, children of her son John H. Hanson, each a lot of the appraised value of $1,000. This disposed of all of the real estate which she owned at the time of her death. She bequeathed $250 each to her sons John H. and Frederick W. and a niece, Jennie Mellor, and $100 to the Old Medium's Home of Chicago, Illinois. Her household goods she divided equally between her sons John H. and Frederick W. Then came the following provisions:

"Twelfth: All the rest and residue of my property, both real, personal and mixed of whatsoever nature or kind and wheresoever situate lying or being, I hereby give, devise and bequeath to B. H. Rhodes in trust to be handled and disposed of as follows:

"1st: I direct that the buggy and any and all other property other than the moneys and securities hereinafter mentioned be sold by my executor and converted into cash. Excepting however such as have been devised by or through the bequeaths herein before mentioned.

"2nd: It is my will and I hereby direct and request that the said B. H. Rhodes handle and attend to my bonds, securities, notes, mortgages and cash, as he has done during my lifetime, that he keep all money out so nearly as he may deem proper at interest and on such securities and at such rate of interest as he may deem proper. That he handle same without giving bond and without intervention of any court, and that he retain ten per cent of the income derived therefrom for his services in so handling the same, and that he pay all taxes and

charges against the same, and that the rest and residue of the increase and revenue derived therefrom, be by him used in the maintenance, education and support of my grandchildren, Helen Hanson, Henry Hanson and Nancy Hanson, and that he use the same to that end as he may deem fit and that he be not required to account to anybody or any court or tribunal in so doing, and that the principal of my said bonds, mortgages, notes, certificates of deposit or other moneys in his hands be upon the coming of age of each of said Helen Hanson, Henry Hanson, and Nancy Hanson distributed equally between them the said Helen Hanson, Henry Hanson and Nancy Hanson, share and share alike, and in the case of the death of either of said minors then the same to go in equal parts to the survivor or survivors of them.

"Thirteenth: I hereby nominate and appoint B. H. Rhodes the executor of this my last will and testament, and it is my will and I hereby direct that no bond be asked or required of him and that the provisions of this will be carried out without the intervention of the probate court, or any other court, other than to admit this will to probate, receive inventory and make order directing payment of the state inheritance tax, if any, and setting the amount thereof.

"Fourteenth: I hereby revoke all former wills by me made.

"In witness whereof I have hereunto set my hand and seal this 24th day of January, 1908."

The will was signed and sealed by the testatrix and was witnessed in regular form, with the usual certificate, by B. F. Bower and W. H. Hodge.

Thereafter Frederick W. Hanson filed in the probate proceedings his petition contesting and seeking to set aside the will; alleging, (1) mental incapacity of the testatrix; (2) that in making the will she was acting under the influence of delusions and hallucinations; (3) that she was acting under undue influence of the executor named in the will, and did not understand its import. Issues were framed, a guardian *ad litem* was appointed to represent the minor legatees, and the case was tried to the court, Honorable M. L. Clifford of Pierce county sitting in Lewis county, presiding. The trial was

lengthy.   Many witnesses were examined.   The record is voluminous.

The court found, in substance, the foregoing facts and that, at the time of making her will, the deceased was of sound mind, memory and understanding, capable of making testamentary disposition of her property, was not controlled nor actuated by irrational or insane delusions, nor acting under any fraudulent or undue influence of any person, and concluded therefrom that the will in question is a valid and legal will. The petition was accordingly dismissed and the executor was awarded his costs.   The petitioner brings this appeal.

Its immense volume prohibits anything approaching a detailed review of the evidence.   We shall essay no more than a bare resume.   Nancy Hanson and Henry Hanson were married about 1854.   To the marriage were born four children, a daughter, Ella, long since deceased, and three sons, John, Frederick and Charles.   Charles died in 1896.   About the year 1882, the testatrix and her husband acquired a tract of land now lying within the city limits of Centralia, Lewis county.   There they spent the remainder of their lives, the son Charles, a minor, living with them until his death.   After the death of Charles, the testatrix and her husband, who had been devout Baptists, became converts to spiritualism.   Henry Hanson died in April, 1905.   Thereafter the testatrix continued to live on the old homestead which, though community property of herself and husband, apparently passed to Mrs. Hanson in its entirety by her husband's will.   At any rate, though the son Frederick, the present contestant, also unsuccessfully contested his father's will, decedent's title, at the time of her death, to the property included in the inventory of her estate is not now questioned.   For a short time Frederick resided with her, but nearly all the time until her death she resided alone with a single companion, who acted in the capacity of general household servant and attendant. This attendant was frequently changed, and we have in the

record the testimony of no less than five women who had occupied that relation.

The elder son, John Hanson, was twice married. By his first wife he had a daughter, Maud, now grown. By his second wife, still living, he had the three children, Henry, Helen and Nancy, the eldest nine and the youngest two years old at the time of the death of the testatrix. John was a confirmed inebriate, providing the barest living for his wife and children, and was the cause of much worry to his mother. She was fond of his children, and up to her death often contributed to their support and comfort. Frederick was a bachelor. Though he seems to have been kind to his mother, there is evidence tending to show that she had little confidence in him because of certain minor financial transactions of which she complained but which it is not necessary here to relate.

In 1904, the testatrix suffered a partial stroke of paralysis. She had practically recovered from this at the time of her husband's death. The death of her son Charles and also that of her husband were severe blows to her. After the last-mentioned event, when she was about seventy-four years old, it is unquestioned that she began to manifest a progressive physical decline. She became obese and was afflicted with varicose ulcers on her lower limbs so that she could not walk. Not long after her husband's death, she took to a wheel chair in which she remained practically for the balance of her life. She was uneducated, being barely able to write her name.

As to her mental condition, the evidence is in hopeless conflict. There was evidence tending to show that, prior to her husband's death, both she and he believed in and practiced spiritualism, consulting the picture of a brother of his whom she referred to as "the guide" and who had been a minister in England, but long since deceased. They apparently believed that through this picture they could consult the brother's spirit and the spirits of others on matters of business or domestic concern. After her husband's death, she continued

these practices, claiming to be able to see and converse with this guide, and especially with the spirits of her son Charles and her husband. Three of her attendants, one of whom was with her for about a month in 1906, another for a month and a half in 1906, and another at intervals from September, 1908, to June, 1909, all testified that the testatrix would frequently claim to be talking to her dead son and her husband; that she often said she had consulted her husband's spirit on business matters; that she required a place set for him at the table at meal times; that she would in the evenings sit at the organ and thrum and sing tunelessly words of little meaning, apparently addressed to the spirits.

As to her personal habits, these three witnesses testified that she was extremely filthy, irritable and suspicious, insisting on having all doors and windows locked; that she was parsimonious to the point of stinginess, barely permitting the purchase of sufficient to eat, and objecting to the use of her good dishes lest they be broken; that she took no interest in her surroundings and would not permit them to read to her. One of these attendants and another witness, a neighbor, testified that the testatrix was unable to recognize her most intimate acquaintances from day to day. These three concurred in the opinion that the testatrix was mentally unsound and incapable of attending to her business affairs, basing that opinion mainly on her belief in spiritualism.

The other two women who had attended her, one from October, 1906, to January, 1907, and again for a month during the summer of 1908, the other for some time in 1909, both denied that testatrix was filthy, or intractable, or irritable, or inordinately stingy, or that there was anything outre in her occasional thrumming and humming at the organ. While both of these testified that the testatrix was a professed believer in and practiced spiritualism, they refused to corroborate the others as to her habitual silly remarks and aloofness from ordinary conversation. Both testified that she

took the daily Portland and Tacoma papers and had the attendant read them to her regularly, being interested in political matters, especially as related to Mr. Roosevelt. These two attendants, while admitting that the testatrix was an eccentric woman, both expressed the firm conviction that she was perfectly sane and fully capable of attending to her business affairs. These same opinions were expressed by nine or ten others, women, business men and tradesmen, who had known her for years; also, by her family physician, who, though not an expert on insanity, had known her for nearly eighteen years and had seen her and treated her frequently during that time. Many of these testified that she readily recognized and conversed with them and inquired concerning their business and family affairs, though seeing them only at considerable intervals of time.

An expert of well known ability and learning was called on behalf of the appellant, and in response to a hypothetical question composite of the testimony of witnesses most favorable to the appellant, gave it as his opinion that a woman acting as described was afflicted with progressive senile dementia. He stated, however, that her belief in, and practice of, spiritualism was no evidence of insanity, except that in one instance she had, as one witness stated, claimed to converse with the spirit of a woman who was not dead. Leaving out the things relating to her spiritualistic beliefs, the things attributed to the testatrix by the composite question were nearly all either positively denied or much modified by testimony subsequently adduced.

After the death of her husband, the testatrix placed her business affairs to a considerable extent in the hands of the respondent, who was and is a lawyer in active practice in Centralia. He testified, that she kept the slips and monthly bills for household and other expenses, and at intervals he would call at her home, go over them with her and write checks for her in payment, which she would sign, and that

she advised with him on different sales of real estate and
other business matters; that she discussed with him the pro-
visions of the will, and that he drew it in its present form as
a result of frequent conferences with her; that he consented
to act as executor only on her solicitation, and after she had
objected to several other persons whose names he suggested.
He and both of the subscribing witnesses testified that the
will was read to her and discussed with her before she executed
it.  He also testified that its provisions were explained to her
and that she explicitly requested him to act without bond
rather than put the estate to the expense of paying for a
bond.  There is much evidence tending to show that the de-
ceased kept a close watch upon her expenditures, knew what
property she owned, and kept in touch with its management.

    In the light of the evidence, we shall consider, briefly as
may be, the appellant's claims.

    I.  Was the deceased possessed of testamentary capacity
when she executed the will?  Where a will, rational on the
face of it, is shown to have been executed in legal form by the
testimony of the subscribing witnesses, the law presumes
testamentary capacity in the testator and that the will speaks
his wishes.  These presumptions are, of course, not absolute,
but the burden is upon a contestant to overcome them by
competent evidence.  There are authorities which hold the
contrary, but we believe the foregoing to be the correct rule.

    "It is a presumption of law that all men are of sound mind
and able to attend to their ordinary affairs.  Sanity of mind
is the normal condition of most human beings, and he who
would prove the contrary in any particular case must pro-
duce evidence to sustain his allegations.  So, applying this
principle to the probate of wills, it is the general rule, which
is sustained by the majority of the cases, that all persons of
the statutory age are presumed to have testamentary ca-
pacity; and it follows from this, that the party who con-
tests the probate of a will upon the grounds of lack of such
capacity has the burden of proof to show incapacity by evi-
dence upon that point, except in the single case where the

testator is shown to have suffered from fixed insanity, not mere delirium, prior to the execution of the will." 1 Underhill, Law of Wills, p. 106, § 86.

See, also, 1 Jarman, Wills (6th ed.), p. 48; *Brown v. Ward,* 53 Md. 376, 36 Am. Rep. 422.

A careful perusal of the entire evidence, of which the foregoing is but a bare outline, convinces us that, unless a belief in, and practice of, spiritualism is an evidence of insanity, the appellant has failed to sustain this burden. While three of her attendants attribute to the testatrix filthiness, irritability, suspiciousness, loss of memory, senseless parsimony, and aloofness, two other attendants, one called by the appellant himself, denied these things and found her merely accentric, but taking a rational interest in her own affairs and in current events. These two had at least as good an opportunity to observe her as the others. Moreover, both of them had known her for years and would certainly have noticed any marked mental deterioration had it existed. The testimony of these two is corroborated by nearly all the other witnesses in these particulars. Eliminating the decedent's belief in spiritualism, we think the evidence clearly sustained the court's finding that the testatrix was of sound mind. While it is true that a belief in spiritualism or in any other religious creed, if played upon by one designing to influence, and thereby actually influencing, the believer's testamentary disposition of his property, may invalidate the will on the ground of undue influence, the belief is of itself no evidence of insanity. Opinions on religion and things occult are essentially speculative in their nature. However little they may appeal to the common judgment, and however devoid of objective sustaining evidence alone, they are not badges of insanity.

"Manifestly, a man's belief can never be made a test of sanity. When we leave the domain of knowledge and enter upon the field of belief, the range is limitless, extending from the highest degree of rationality to the wildest dream of superstition, and no standard of mental soundness can be

based on one belief, rather than another. What to one man is a reasonable belief is to another wholly unreasonable. And while it is true that belief in what we generally understand to be supernatural things may tend to prove insanity under certain circumstances, it is a well known fact that many of the clearest and brightest intellects have sincerely and honestly believed in spiritualism, mind reading, etc." *Whipple v. Eddy*, 161 Ill. 114, 43 N. E. 789.

In *In re Siebs' Estate*, 70 Wash. 374, 126 Pac. 912, Ann. Cas. 1913 E. 125, in passing upon the sanity of a man whose mental and physical condition, as shown by the evidence, was strikingly similar to the most extreme evidence as to the deceased in this case, we said:

"It was shown also that, for a time at least, Mr. Drury attended spiritualistic gatherings, and seemingly had faith in the doctrine of spiritualism; that he believed in the materialization of spirits, and apparently other spiritualistic phenomena, and sometimes spoke of having communed with his deceased wife. But it is not necessarily an evidence of insanity to believe in spiritualism. The great majority of civilized human beings believe in a life beyond the grave. Based upon that belief, many widely different religious creeds have been established, and the fact that an individual may believe in one of these and discard others is not evidence of unsoundness of mind, even though the creed selected may be the less common belief and, to the majority of mankind, less capable of being defended than some that are more common. No one belief has a monopoly of men of intellectuality. It is well known that many of the clearest and brightest intellects have firmly believed in the doctrine of spiritualism, and in the reality of spirit manifestations that ordinarily accompany the practice of its teachings. But it is said that Mr. Drury, while alone in his room, would read from the bible in a loud tone of voice, would engage somewhat vociferously in prayer, and would sing hymns whose wordings were not altogether congruous, to tunes not found in the hymnal. But this was nothing more than the manifestation of a deeply-felt religion. Mr. Drury was fast approaching the end of the span allotted to the life of man. It is to be supposed that his faculties had become somewhat dimmed,

that his memory would not at all times recall the words of
songs as they were written, and that his voice had lost some
of the freshness of youth. But this is not insanity."

See, also, *Middleditch v. Williams*, 45 N. J. Eq. 726, 17
Atl. 946, 4 L. R. A. 738; *Brown v. Ward, supra.*

II. Does the evidence show that the testatrix was acting
under the influence of an insane delusion when she made her
will? We think not. Even if it be conceded that a belief in
spiritualism is a delusion, there is no evidence that the testa-
trix, in making her will, was controlled by that belief. True,
some of the witnesses testified that she had said she consulted
the spirit of her husband in regard to her will, but there is
nothing to show that her own views are not expressed in the
will. In fact she expressed herself to more than one witness
as perfectly satisfied with it. But as we have seen, a belief
in spiritualism is not *per se* an insane delusion. It is only
when there is some evidence tending to show that the belief,
whether in spiritualism or any other dogma, has been played
upon so as to induce a will which otherwise would not have
been made, resulting in what may be called an unnatural dis-
position of the testator's property, that any court, so far as
we are advised, has ever characterized the belief as a delusion.
In every such case which has been called to our attention, the
real ground of decision was either undue influence exercised
through the belief, or the very terms of the will and the sub-
jects of the testator's bounty were traceable solely to the be-
lief. The delusion in either case lies, not in the belief, but
in the false assumption of some other controlling fact induced
by the belief. As illustrative cases see: *O'Dell v. Goff*, 149
Mich. 152, 112 N. W. 736, 119 Am. St. 662, 10 L. R. A. (N.
S.) 989; *Orchardson v. Cofield*, 171 Ill. 14, 49 N. E. 197, 63
Am. St. 211, 40 L. R. A. 256; *Thompson v. Hawks*, 14 Fed.
902; *McIlroy's Estate*, 10 Pa. Dist. Rep. 78; *Ingersoll v.
Gourley*, 78 Wash. 406, 139 Pac. 207. Obviously every such
case must rest upon its peculiar facts. There is not a word
of testimony in the case before us that the will was in any

sense the result of the belief of the testatrix in spiritualism, or that through that belief she was influenced to make a will which otherwise she would not have made.

III.   We find nothing in the record reasonably sustaining the charge of undue influence on the part of the executor. Nor do we find that the will was not fully explained to, and understood by, her.   The will in its essence is a nonintervention will.   Such is the effect of its provision that the executor should not be required to account to any court or person. The executor testified that this provision was explained to the testatrix as intended to protect him in his handling of the estate in the interest of the minor children of John Hanson, free from interference on his part.   This was clearly what she wanted.   The provision is, of course, inoperative in the full breadth of its terms, but there is no evidence that the testatrix did not fully understand its words and its purpose.   The executor, as trustee, if recreant to his trust, can, of course, be forced to account to the beneficiaries.

The objects of the bounty of the testatrix and the manner in which the bounty is bestowed are in no sense unnatural. The will itself evidences neither insanity, delusion nor undue influence.

The judgment is affirmed.

MORRIS, C. J., MAIN, and FULLERTON, JJ., concur.