[No. 30199.   Department Two.   July 18, 1947.]

*In the Matter of the Estate of* JOHANNA KLEIN, *Deceased.*
MATHILDA REDHEAD, *Respondent and Cross-appellant,* v.
CARL P. LANG, *as Executor, et al., Appellants.*[1]

*Luby & Lang* and *Powell & Nethercutt,* for appellants.

*Paine, Lowe & Coffin,* for respondent and cross-appellant.

[1] Reported in 183 P. (2d) 518.

STEINERT, J.—This was a proceeding to contest the will of Johanna Klein, a widow, now deceased. At the time of executing the purported will, on June 14, 1944, Mrs. Klein was eighty-one years of age. By the terms of that instrument, she bequeathed to her daughter, an only child, the sum of one dollar; to the pastor of her church she bequeathed the sum of one hundred dollars, and a like sum to the minister who should officiate at her funeral; the remainder of her estate, appraised at approximately twenty-two thousand dollars, she bequeathed and devised to St. John's Evangelical Lutheran Church, in Spokane, of which she was then a member. Upon the death of Mrs. Klein, in April, 1946, the will, which was of the nonintervention type, was admitted to probate, and the executor named therein thereupon duly qualified and immediately proceeded to administer upon the estate.

On May 6, 1946, the daughter of the deceased filed a petition in contest of the will, alleging that at the time of its execution the decedent was not of sound and disposing mind. Issue being joined on the petition, the cause was tried to the court sitting without a jury. The trial, lasting six days, resulted in findings and conclusions by the court, declaring that at the time of executing the will the testatrix was laboring under an insane delusion and hallucination materially affecting the testamentary instrument. A decree was entered accordingly, setting aside the order of probate and revoking the will, but allowing to the executor his costs actually incurred, including attorney's fees fixed by the court, all to be paid out of the estate. The executor, the minister who officiated at the decedent's funeral, and the church have appealed from that portion of the decree revoking the will, and the daughter, who is the sole surviving heir at law of the deceased and contestant herein, cross-appealed from that part of the decree which allowed costs and attorneys' fees to the executor.

The sole question involved upon the main appeal is whether the record establishes, by clear, cogent, and convincing evidence, that at the time of making the alleged

will Johanna Klein was suffering from an insane delusion materially affecting the terms of that instrument.

The size of the record in this case makes it impracticable to set forth in complete detail the evidence as given by the thirty witnesses who testified at the trial. We must perforce confine ourselves to a general statement of the facts, particularizing them only to the extent necessary to a clear understanding of the issues and the basis of the trial court's decision.

The decedent, Johanna Klein, was born in Germany in about the year 1863, and, when fourteen years old, came to the United States. She first settled in Colorado, where, at the age of sixteen years, she married William Klein. Respondent, Mathilda Redhead, who was born in 1886, is the only child of that union. In 1900, the Klein family moved to Spokane, acquired a home, and lived in that city continuously until the death of Mr. Klein in 1935, after which Mrs. Klein continued to live there until her death in 1946, she being then eighty-three years of age.

Although Mrs. Klein understood and could speak the English language, she was more proficient in the German tongue. When talking with her daughter or with her German friends, she would carry on her part of the conversation largely in that vernacular. She could read English print, but not English script. Throughout her life she remained intensely loyal to her German heritage and resented any reflections on the German people or the land of her nativity, even during those periods when the United States was at war with that country. For many years, and at the time of her death, she was a member of the Daughters of Herman, a secret society composed of women of German extraction; in that organization she maintained a benefit payable upon her death.

From the time of her arrival in Spokane until about 1904, Mrs. Klein was a regular attendant at St. John's Evangelical Lutheran Church, in Spokane, one of the appellants herein, and in 1907 her daughter Mathilda and Bert C. Redhead were married in that church. After 1904, however,

Mrs. Klein seldom attended any house of worship until about 1932, when for approximately two years she attended a church of the Presbyterian faith. During the intervening years, she nevertheless continued the use of her German bible and also a hymn book which contained prayers in one portion printed in German.

Mr. and Mrs. Redhead have lived in Spokane ever since their marriage in 1907. They have two sons, the younger of whom is about twenty-four years of age; the older one is married and lives in San Francisco. Mr. Redhead, now about seventy-two years old, has for the greater part of his active life been an accountant in the employ of a Spokane transfer and storage company; he is now employed in the county clerk's office.

This introductory statement covers generally the period of Mrs. Klein's life up to the time of her husband's death in 1935, at which time she was about seventy-two years of age. The record in the case bears no other interpretation than that during all those years, both before and after the marriage of her daughter Mathilda, the utmost harmony, love, and affection existed between Mrs. Klein and the daughter. The two families, though living in different parts of Spokane, visited each other frequently and occasionally took trips together. Mrs. Klein habitually evinced her love for her daughter and her two grandsons, and they in turn manifested a like affection for her.

Only two incidents are mentioned in the evidence as indicating, during that period, any resentment or pique on the part of Mrs. Klein toward any member of the Redhead family: In her consultation with her attorney at the time he drew her will in 1944, she told him that on one occasion, during World War I, she and her husband had accompanied Mr. and Mrs. Redhead on an automobile trip to Wallace, Idaho; that during the trip Mr. Redhead made some remark derogatory to the German people; and that, on their return from the trip, Mr. Klein indicated his resentment of the remark and stated to her that he did not want any of his property to go to Mr. Redhead. That occurrence, it will be

noted, took place prior to 1919, more than fifteen years before Mr. Klein's death. It may also be stated that Mr. Redhead, when questioned at the trial, had no recollection of any such remark. The other incident was brought to light at the trial by one of the witnesses who testified that, in a casual conversation with Mrs. Klein on the street some years before, the latter had complained that one, or both, of her grandsons had said that "Grandma was Scotch; Grandma was tight." The evidence shows, however, that Mrs. Klein was at all times deeply attached to her grandsons and that they bore a like affection toward her.

After the death of her husband in March, 1935, Mrs. Klein continued to occupy her home, on College avenue in Spokane, with a nurse in attendance a part of the time. In September of that year, she rented her house and moved into the Redhead home at 1903 west Tenth avenue, where she remained for about seven months, living with the family but having her own private bedroom. In April, 1936, she took a small apartment in the Temple Court Building, where one of her friends, a Mrs. Miller, also resided. While living in that apartment, Mrs. Klein became ill and was taken to a hospital, where she underwent an operation. Thereafter, while convalescing, she spent about three weeks in the home of her daughter and was cared for by her. She then returned to her apartment, where she remained about a year or a little longer. In September, 1937, she moved back into her own house, and in November of that year made a trip to California, where she spent several months living in a hotel and visiting one of her two grandsons.

Upon her return to Spokane in March, 1938, she resumed occupation of her home on College avenue, which in the meantime had been rented furnished. There she remained until November, 1943, except for one winter when she boarded with a neighbor.

During all the periods of time that Mrs. Klein resided either in her own house or in the apartment house, she made frequent visits to her daughter's residence, as often

as two or three times a week, and the daughter in turn visited her mother, frequently spending an entire afternoon with her. Mr. Redhead also at times accompanied his wife on such visits when made in the evening. The relations between the parties were always cordial, and there was nothing to indicate anything other than a deep family affection.

In the fall of 1943, Mrs. Klein had become very lonely. More and more she seemed to feel the absence and loss of her deceased husband, and on many occasions she spoke in terms of personal address to him, as though he were still with her or as though she would soon join him.

In November of that year, arrangements were made by which Mrs. Klein again came to live at her daughter's home. At the same time, her house was rented, furnished, to a family by the name of Kasbaugh, who were acquaintances of Mrs. Redhead.

In the meantime, about August, 1942, Mrs. Redhead had taken employment at the Spokane Air Depot and continued in that position until December, 1945. She worked six days a week, leaving home at six-twenty in the morning and returning at five in the afternoon.

While living in the Redhead home, Mrs. Klein prepared her own breakfast, after both Mr. and Mrs. Redhead had gone to work; she also took care of her own room; occasionally, she would voluntarily assist Mrs. Redhead with the dishes in the evening, although she usually retired at six or seven o'clock. Mr. Redhead would customarily go to her room in the morning before leaving for his work and bid her goodbye.

It appears that Mrs. Klein wanted to pay for her board while living with her daughter, but Mrs. Redhead refused to accept anything. Ultimately, it was agreed that Mrs. Klein would pay twenty dollars a month, out of the monthly sum of forty dollars she was then receiving from the rental of her house.

At times while Mrs. Klein was residing at the Redhead home, friends were invited in for dinner. Mrs. Klein al-

ways seemed to enjoy these occasions and partook of the festivities. The younger of her grandsons was an amateur magician and at times, when he was at home from army service, would perform various tricks, much to the delight of his grandmother.

It further appears that for many years Mrs. Redhead was a member of a prominent fraternal organization and took an active part therein, holding various offices from time to time. Frequently, on special occasions, when open meetings were held, she took her mother along to witness the exercises. Mrs. Klein enjoyed these opportunities and expressed to others her great pride in her daughter's attainments and the affection she felt toward her.

A short time after Mrs. Klein came to live at the Redhead home in the fall of 1943, Mrs. Redhead planned to purchase a new prayer book to present to her mother on the latter's birthday. With that in view, Mrs. Redhead called the pastor of St. John's Evangelical Lutheran Church, of which Mrs. Klein had been a communicant prior to 1904, but which she had not since then attended. Reverend Clarence M. Amling, the incumbent pastor, learning that Mrs. Klein had been a former member of the church, visited the Redhead home and examined the prayer book which Mrs. Klein then had. Shortly thereafter, Mrs. Redhead purchased and presented to her mother the new prayer book.

About the first of February, 1944, Mrs. Klein began attending Reverend Amling's church. This was at the invitation of the Kasbaughs, her tenants, who were also members of that church, and who offered on a particular occasion to call for her and bring her back. Thereafter, Mr. Redhead would take her to the church on Sundays, and, when the hour of German services was over, would meet her there and bring her home. In the meantime, Mrs. Klein had gotten acquainted with Mr. Carl P. Lang, an attorney, the appellant executor herein, who was also a member of that church and who spoke German. Through the courtesy of Mr. and Mrs. Lang, who, on their way to church, passed the Redhead home, Mrs. Klein frequently accom-

panied them to the Sunday services. Other church members, living in the neighborhood, also at times would take her. Mrs. Klein thus became a frequent, though not a constant, attendant at the Lutheran church, and in time seemingly contemplated the idea of willing some of her property to that institution. Reverend Amling, as pastor, called on her frequently and conversed with her, but it is clear from the record that he neither did nor said anything to suggest or encourage the idea of her leaving anything to the church; in fact, there is nothing to indicate that he then had any knowledge whatever that she had such thought in mind.

It should be stated here, however, that by this time Mrs. Klein had become quite feeble. She was eighty-one years of age, suffered considerably from arthritis, had become very forgetful, and would frequently relate conversations had with "papa," meaning her deceased husband.

Sometime between February and May, 1944, a most unusual and unfortunate incident occurred in the Redhead home, due to which Mrs. Klein's former affection for her daughter underwent a radical change, and out of which this litigation ultimately arose.

It appears that, while last living at the Redhead home in 1943-44, Mrs. Klein had invited some of her friends in for luncheon. Mrs. Redhead, who, as stated before, then had regular employment, was obliged to be away from home during the daytime. On the evening before the luncheon, Mrs. Redhead prepared the food to be served the next day by her mother. The menu included individual pineapple tapioca puddings, which were put in thin opalescent glasses and placed in the refrigerator. Four of these glasses were left over from the luncheon. That evening, Mrs. Redhead, on her return from work, and Mrs. Klein ate dinner together, Mr. Redhead not yet having arrived. Two of the left-over puddings were served as a dessert. Mrs. Klein, after taking several spoonsful of the pudding, discovered some hard substance in her mouth and made a remark about it. Upon examination, it was found that a small triangular piece of glass, less than a quarter of an inch in

length, had caught in Mrs. Klein's teeth. Mrs. Redhead then examined the glass container and found that a corresponding piece of glass had been chipped off its edge. The container and its remaining contents were immediately removed from the table, and another glass of the pudding substituted therefor. The two women then finished their dinner together without further mishap. Mr. Redhead, on his arrival home shortly thereafter, was told of the occurrence and made some jocular, though innocent, remark about it; Mrs. Klein, however, did not take kindly to the intended humor, but, rather, seemed to resent it. As between Mrs. Klein and Mrs. Redhead, no further mention was made of the incident until about a year afterward, when rumors came to Mrs. Redhead that Mrs. Klein, in talking with various people, had been accusing her, or both her and Mr. Redhead, of attempting to kill or poison Mrs. Klein.

The record is replete with such accusations. A few of these instances may be recited. A short time after the occurrence, but before her will was drawn in June, 1944, Mrs. Klein talked with Reverend Amling with reference to her desire to leave her money to the church. On that occasion, she told him in detail about the glass incident and appeared to be quite excited about it, saying to him "What do you think of that now? Do you think they want to take my life?" Reverend Amling endeavored to calm her, telling her "that surely would be a mistake, nobody would attempt to do a thing like that." Evidently, however, Mrs. Klein was not convinced that it was simply a "mistake."

Mrs. Sophie Postel, who was a friend of forty years' standing, testified that during a visit with Mrs. Klein, the latter told her of the pudding incident and started to cry, exclaiming, "Oh, my daughter wanted to poison me. I found glass in the food." Mrs. Postel remonstrated with her, saying, "Mrs. Klein, you put that out of your head. I know Tillie (I called her 'Tillie') better than you do. She would never do anything like that." Mrs. Klein's answer

was, "Yes, I know she did," and, further, "They shouldn't have a thing. I won't give anything to them."

Upon one occasion, when shopping, she entered a department store and talked with Mr. Frank J. Kromer, the department manager and a long-time friend of the family. The substance of their conversation is contained in the following quotation from his testimony:

"Well, she had a habit of kind of pointing her finger, and she said, 'You know, Mr. Kromer, something happened up there,' she says, 'and I know just what they are trying to do.' I said, 'What do you mean, Mrs. Klein?' And she said, 'Well, I was up there and I found a little piece of glass in the food,' and I said, 'Well, what about that?' And she said, 'Well, I think somebody put it there in the Redhead family,' and I said, 'Well, what for?' and she said, 'I think they are trying to do away with me,' and I said—Can I mention what I told her? I said—I always called her 'Mother.' I said, 'Why, Mother, that is ridiculous. Your daughter wouldn't harm a hair in your head. You want to forget that stuff.' I said, 'There is absolutely nothing to that.' 'Well, I don't know,' she said. I couldn't get that out of her head. She was suspicious about it."

To Mr. Thomas J. Pearce, who lived across the street from Mrs. Klein's residence, she on several occasions made the statement that her daughter had tried to kill, or poison, her, and that she had left, or was leaving, everything she had to the church.

Mrs. W. A. Matlock testified that Mrs. Klein told her of the glass incident a number of times, saying that "Tilda was trying to get rid of her so she could get her money."

She repeated the incident many times to Mrs. E. K. Minor, her next-door neighbor, and, in mentioning Mr. and Mrs. Redhead, said that "they would be surprised when they found out about the will."

Many other instances of such recitals appear in the record, indicating that Mrs. Klein seemed to be obsessed with the idea that her daughter, or some member of the Redhead family, had put glass in the pudding purposely to effect her death.

Shortly after the pudding incident, Mrs. Klein conferred

with Reverend Amling and told him that she wanted to leave all her money to the church. He referred her to Mr. Lang, as being a member of the church who spoke German and who would attend to the matter of drawing a will for her. In the latter part of May, 1944, Mrs. Klein consulted Mr. Lang, who on June 14, 1944, after several appointments and conferences with her, drew the will here in contest. The record discloses that Mr. Lang performed his professional services carefully and faithfully, and drew the will exactly as Mrs. Klein directed that it should be drawn. Learning that she did not want to leave her daughter anything, he inquired the reason why. She told him that she had not gotten along well with her daughter; that, while living at the Redhead home, she had been required to do things which she did not want to do; that Mr. Redhead had at one time made a derogatory remark concerning the German people; that the Redhead family was improvident and lacking in religious spirit; and that she felt that, because she had in years past failed to contribute to the support of the church, she should will all her property to that institution. However, in her conference with Mr. Lang, she also mentioned the matter of finding the glass in the pudding. Mr. Lang, being convinced of her expressed desire, suggested that she should at least leave to her daughter "some of the family keepsakes and pictures and things of that kind." Mrs. Klein stubbornly insisted that she would not leave the daughter anything.

About two weeks after the will was executed, the tenants who had been renting from Mrs. Klein vacated the premises, having purchased a home of their own, and Mrs. Klein thereupon left the Redhead residence and moved back into her own house. Thereafter, Mr. and Mrs. Redhead visited Mrs. Klein regularly, and Mr. Redhead kept her fuel receptacles filled and did other chores about the house. They also brought Mrs. Klein to the Redhead home on frequent occasions, for dinner and other social events, at which various old-time friends were present. At other times, Mrs. Redhead would send her mother dishes of food, particularly those things which she knew her mother relished. Unknown

to Mrs. Redhead, however, Mrs. Klein suspected that something was wrong with the food and would not eat it; instead, she fed it to a cat or else threw it away.

During all this period of time, Mrs. Redhead was unaware of the accusations which Mrs. Klein was making against her to others with reference to the glass incident. In the course of time, however, the accusations became so widespread that rumors thereof began to reach Mrs. Redhead. Matters went on in this fashion until November, 1945, when Mrs. Redhead called on her mother one evening with the view of discussing the reports that had been coming to her. Mrs. Redhead endeavored to explain the cause of the piece of glass getting in the pudding. Mrs. Klein apparently was not satisfied with the explanation, for her only rejoinder was, "Well, it was there."

Anticipating what might be her mother's attitude in the face of any explanation or of any effort to convince her that she was utterly mistaken, Mrs. Redhead had beforehand prepared a typewritten letter which she took with her on the occasion of that visit. Realizing that her explanation and efforts were unavailing, she left the letter on her mother's table and departed. We think it well to quote the letter:

"To my Mother:

"What I am saying here, is said in a kind way, without any ill feeling whatever. However knowing the way you feel toward me, and saying the unkind things about me to your friends, and my friends, I feel the thing for me to do is to stay away until such a time as you can have more loving thoughts in your *mind* and *heart* toward me. If ever you do feel that way, let me know.

"I never could feel toward my Sons as you do toward me, and I am ready to do for them, and even sacrifice for them in any way, and willing to help them as long as I live, for I realize God gave them to me, and they are His children. I also stand ready to do anything I can to help you at any time, should you so desire.

"You say you read your bible every day, I also read my bible, also the 23rd. and 91st. Psalm. I know no one can enter the Kingdom of Heaven, by allowing their minds to be filled with anger, unkind thoughts, and hatred, therefore

we must learn to concentrate on only the good things to be seen and heard of our fellow men. I think the Elderbloom have a very fine greeting when they say 'I know something *good* about you.'

"I cannot help if you wrongly interpret or misconstrue my ways, and deeds, as I have never done anything intentional to hurt you in any way. You cannot but know that I am a Christian at heart. I do not drink, smoke, and have never done anything in my life to be ashamed of, and have not one single regret, if I were called beyond at any time.

"I got a great deal of pleasure taking you things to eat that I knew you liked and would enjoy, as I felt you were not preparing the variety of food you should have from a healthful standpoint, as I know it is not easy to cook for just oneself, and I did think that was one way of showing you that I did love you, and had your interest at heart.

"I never will forget my fathers loving kindness toward me, and I often think of the wonderful talks we had together, and how on several occasions he told me that he knew mamma would never do other than the way they had planned together, and that he knew he could *positively* trust mamma regarding my welfare.

"I thought when you gave me the tomatoes, the earrings and the flowers, that I *must be mistaken,* and that your attitude toward me had changed, however I want to forget all the things I have been told, and am sorry that you did not appreciate my love for you.

"So until you have a change of feeling toward me,
"Lovingly,
"Tilda"

It is regrettable, but true, that the mother and daughter never saw nor heard from each other again in the lifetime of Mrs. Klein, who passed away alone on April 1, 1946.

There was further evidence in the case to the effect that over a course of years Mrs. Klein entertained a suspicion that people were trying, or might try, to steal from her. With that thought in mind, she habitually arranged little pieces of wood in the locks of her house and outbuildings and placed similar pieces behind the screen doors, so that if later she found that any of them had been dislodged or moved she would know that someone had been tampering with the doors.

As may be expected, there was considerable medical testimony in the case. Two physicians who were specialists in neuropsychiatry were called by the respondent, and one by the appellants. However, none of the physicians had examined, or was acquainted with, Mrs. Klein in her lifetime.

The two physicians who were called by the respondent explained in detail the pathological processes and progressive changes attendant upon senile dementia, and the characteristic delusions which accompany it. They characterized a "delusion" as an illogical conclusion retained by the patient, from which he cannot be dissuaded by rational proof, arising either from some hallucination or from a misinterpretation of some actual event. These delusions, they said, were often directed against persons in close proximity, members of the family, and those whom the patient formerly loved most. Illustrations which they pointed out covered many of the symptoms exhibited by Mrs. Klein in her declining years. The physicians were emphatic in their opinion that, while such persons might often be able to attend to the ordinary affairs of their lives, nevertheless their delusions would certainly govern their actions so far as the objects thereof were concerned.

The physician witness who was called by the appellants gave the most direct testimony on the question here under consideration. On direct examination, in answer to a long hypothetical question summarizing the facts as testified by the witnesses, he expressed his opinion as follows:

"That she [Mrs. Klein] was able to conduct her business and that her memory and intellectual faculties were sufficiently preserved for her to do ordinary things, I think has been demonstrated, but I feel sure that she was prejudiced or biased by this incident [the pudding incident], and possibly by other incidents which had occurred before, and in my opinion it is pretty much a matter of degree of how much this bias or prejudice or misinterpretation interfered with her usual conduct."

Then, on cross-examination, he testified that, in his opinion, Mrs. Klein suffered a delusion concerning the glass incident; that her conversations with her dead husband were

"in the nature of an hallucination"; and that she was influenced by the feeling that her daughter "had designs upon getting her money." His entire expert opinion may be summarized in the following excerpt from his testimony:

"Q. Each delusion is in regard to a particular thing? A person has one delusion as to a single thing, such as a delusion that the daughter has attempted to harm her, take her life, injure her, by putting glass in her pudding? A delusion will not operate or affect her actions in ordinary business affairs with which the daughter had no concern? Isn't that true? A. That is quite possible. Q. And that is what you mean by your answer? A. That is what I mean. Q. But in regard to her transactions with her daughter, she would in all probability be affected by the delusion at all times? A. Yes."

While our review of the evidence has gone to a considerable extent, it does not purport to cover it in detail. Only by reading the six hundred fifty pages of the typewritten statement of facts can one obtain full knowledge of the testimony. At the conclusion of the hearing, the trial court, in an oral opinion followed by a written memorandum decision, made an exhaustive analysis of the evidence and reviewed the applicable legal authorities. Thereafter, the court made findings of fact which read in part as follows:

"(4) That said will was executed by the deceased at a time when she was laboring under an insane delusion and when she had a fixed and irremovable belief that her only daughter, Mathilda Redhead, either alone or in conjunction with her husband, Bert C. Redhead, desired to get rid of her to secure her property, and that they had attempted to poison her, which delusion and insane belief was without foundation and fact.

"(5) That various persons who were close friends of Johanna Klein attempted to dissuade her from her belief, but that her idea was so firmly fixed that she could not persuade herself to believe otherwise.

"(6) That at the time of the execution of the will and some time before, the deceased was suffering from senility and senile dementia and had hallucinations which were evidence of mental illness, and that the making of her will was materially affected by her delusion existing at the time, and that but for such delusion her will would have been different.

"(7) That because of the delusion existing at the time of the making of said will, the deceased was prevented from normally recollecting the natural objects of her bounty and therefore lacked testamentary capacity in that respect."

Without further comment on the evidence, we will say that, having read the record in its entirety, we are in complete accord with the trial court's findings. We say this in full recognition of the well-established rule that, in order to overcome a will, the testimony must be clear, cogent, and convincing. *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331; *In re Jolly's Estate,* 197 Wash. 349, 85 P. (2d) 267; *In re Schafer's Estate,* 8 Wn. (2d) 517, 113 P. (2d) 41; *In re Miller's Estate,* 10 Wn. (2d) 258, 116 P. (2d) 526; *In re Bottger's Estate,* 14 Wn. (2d) 676, 129 P. (2d) 518; *In re Johnson's Estate,* 20 Wn. (2d) 628, 148 P. (2d) 962.

This means, of course, that the evidence must be such as to clearly convince the trier of the facts. *In re Jones' Estate,* 178 Wash. 433, 34 P. (2d) 1111.

In their discussion of the legal phase of the case, appellants quote from, and largely rely upon, the case of *Dean v. Jordan, supra,* and the cases which followed it. Their discussion is founded, however, upon the law affecting general testamentary incapacity through mental unsoundness.

That is not the precise matter with which we are here concerned. As already stated in the forepart of this opinion, the question here is whether the decedent was, at the time of executing the will, suffering from an insane delusion which materially affected the terms of that instrument.

As stated in *In re Shank's Will,* 172 Wis. 621, 179 N. W. 747:

"It is not a question whether testator had general testamentary capacity, for many persons laboring under insane delusions may be competent to make a will (*Will of Cole,* 49 Wis. 179, 5 N. W. 346), but whether the insane delusion under which the testator suffered materially affected the will he made. In other words, is it reasonably certain that but for the insane delusion his wife would have received a materially larger devise?"

That statement is quoted with approval in *In re Elbert's Will,* 244 Wis. 175, 11 N. W. (2d) 626.

■ Much has been said and written, by judges and by text writers as well, upon the subject of insane delusions, and numerous definitions of the term have been given. Summarizing the many definitions that have been offered, we may say that an insane delusion denotes a false belief, which would be incredible in the same circumstance to the victim thereof were he of sound mind, and from which he cannot be dissuaded by any evidence or argument.

For similar definitions, see 1 Page, Wills (Lifetime ed.) 290, § 141; 1 Schouler, Wills, Executors and Administrators (6th ed.) 150, § 130; 21 Words and Phrases 573, *et seq.*

■ Considering the evidence in this case in its entirety, we have no hesitancy in adopting as correct finding No. 4 of the trial court, to the effect that, at the time of executing the will here in question, the testatrix was laboring under an insane delusion that her daughter, either alone or in conjunction with her husband, desired to get rid of her and had attempted to poison her in order to secure her property; and that such insane belief was without foundation in fact.

■ An insane delusion having been found to exist, it becomes necessary to determine whether such delusion materially affected the will or some provision thereof. It is not every insane delusion that will render a will invalid, but only such as enters into the product of the testamentary instrument. *In re Hanson's Estate,* 87 Wash. 113, 151 Pac. 264; *In re Miller's Estate, supra*; 1 Schouler, Wills, Executors and Administrators (6th ed.) 160-166, §§ 136-139.

"A delusion which induces testator to make his will, but which does not affect the provisions of such will, does not render it invalid.

"If, however, the insane delusion does affect the memory and understanding of the person who suffers therefrom as to the nature and. extent of his estate, the proper objects of his bounty and the nature of the testamentary act, such person has not capacity in law to make a will. An insane delusion that testator's wife has been unfaithful, or that testator's children were not his own, or that testator's daughter was a member of a house of ill fame; . . . or that the brothers of the husband of testatrix whom she

had scarcely ever seen would induce her husband to give to them whatever property she left to him, will avoid a will induced thereby." 1 Page, Wills (Lifetime ed.) 318, § 158.

In Rood, Wills (2d ed.) 102, § 137, appears this statement:

"No will can stand that is induced by an insane delusion concerning anyone who, but for such will would succeed to the property, either by virtue of a former will or by intestate succession; and it is for this class of delusions that wills are most frequently assailed. For example, the will is avoided by a mere insane hatred for the person prejudiced by such hatred, or by an insane belief of any prejudicial thing concerning him or her that she was not his child, that she was a prostitute, or that the testatrix had been wronged by her children."

In *Ingersoll v. Gourley*, 78 Wash. 406, 139 Pac. 207, the court's interpretation of the facts was that the deceased was wholly under the domination of his belief that he must account to the Lord for all that he had; that the proper way to so account was to give to the poor; and that for this purpose the Lord had authorized one Gourley to act as His steward. The will appointed Gourley as executor without bond and clothed him with full power and authority to carry out the trust in such manner and by such methods as in his discretion seemed best. In affirming a decree setting aside the will because of such insane delusion, this court said:

"The believer in such a delusion is insane on that subject and, when it appears that he is prompted by that delusion to make a will, the will cannot be sustained."

In the case at bar, the trial court found, in its finding No. 6 set forth above, that the execution of the will by Mrs. Klein was materially affected by her insane delusion already described, and that, but for such delusion, her will would have been different. As we read the record, the evidence is clear, cogent, and convincing that such were the facts. For all the reasons hereinbefore given, we hold that the trial court properly revoked the will after setting aside the probate thereof.

Respondent has cross-appealed from two orders made by

the court allowing appellants their costs, attorneys' fees, and an executor's fee, the greater part of which total amount was allowed for services rendered and expenditures made in resisting the will contest.

Respondent contends (1) that the court erred in allowing attorney fees to the losing proponent of the will, and (2) that, in any event, the fees allowed the executor and his attorney are excessive. The first contention is based on Rem. Rev. Stat., § 1389 [P.P.C. § 218-9] which reads:

"If the probate be revoked or the will annulled, assessment of costs shall be in the discretion of the court. If the will be sustained, the court may assess the costs against the contestant, which costs may in the discretion of the court include a reasonable attorney's fee."

If the statute be considered in the light of what it literally provides and what it otherwise fails to provide, a very strong argument may be made in support of respondent's contention. This court has been confronted many times with disputes concerning the allowance or disallowance of such items in cases involving will contests and similar proceedings. See the following: *In re Eichler's Estate,* 102 Wash. 497, 173 Pac. 435; *In re Geissler's Estate,* 110 Wash. 14, 187 Pac. 711; *In re Sharpnack's Estate,* 138 Wash. 473, 244 Pac. 715; *In re Vaughn's Estate,* 149 Wash. 291, 270 Pac. 1030; *In re Zimmerli's Estate,* 162 Wash. 243, 298 Pac. 326; *In re Simpson's Estate,* 169 Wash. 419, 14 P. (2d) 1; *In re Fischer's Estate,* 196 Wash. 41, 81 P. (2d) 836; *In re Jolly's Estate,* 3 Wn. (2d) 615, 101 P. (2d) 995, 128 A. L. R. 993.

In some of these cases such claims were disallowed; in others, they were allowed. The peculiar facts respectively involved had much to do with the decisions in most of them.

In the *Simpson* case, *supra,* it was stated that such matters rest in the discretion of the trial court, and that, in the absence of a showing of an abuse of discretion, the holding of that court will not be disturbed.

In the *Jolly* case, *supra,* this court approved the allowance of an executor's fee and reimbursement for costs, including

an attorney's fee, even though, in defending against a contest, the executor did not succeed in upholding the will which had previously been admitted to probate. Holding that the matter was within the discretion of the court, determinable by the facts in the case and the good faith of the executor, we said:

"If the rule contended for by appellant be now adopted, then, in the future, an executor in the position in which McCarthy was when he was cited into court, must either default or show cause at his peril, or, having gone to the point to which McCarthy went and prevented the revocation of the will under which he was acting by securing a jury verdict and a judgment sustaining it, in case an appeal should be taken from that judgment, would be compelled to let the appeal go by default or run the chance of never being reimbursed for his own outlays and expenses, to say nothing of having his adversary's costs charged against him if the appellate court should reverse the trial court. Since duty and the law require an executor to defend in such a situation, he should not be required to defend at his peril."

The rule for which the *Jolly* case, *supra,* is ample authority and which in our opinion is supported by the weight of judicial opinion and better reasoning is this: Where a will is contested, whether before or after its probate, it is the duty of the executor to take all legitimate steps to uphold the testamentary instrument; and if he does so in good faith, he is entitled to an allowance out of the estate for his costs and reasonable attorney fees necessarily incurred by him, regardless of whether or not he is successful in his defense against the contest of the will. 33 C. J. S. 1217, Executors and Administrators, § 225; 21 Am. Jur. 690, Executors and Administrators, § 549. For exhaustive annotations on the subject, see 10 A. L. R. 784, supplemented by 69 A. L. R. 1053, and 128 A. L. R. 1002.

The instant case comes clearly within the rule, and the court rightly followed it.

With respect to the amounts allowed by the court, these

were likewise within its discretion and we perceive no abuse in its exercise thereof.

The decree is affirmed in all respects.

MALLERY, C. J., ROBINSON, JEFFERS, and HILL, JJ., concur.

September 12, 1947. Petition for rehearing denied.